# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Case No. 1:20-bk-10742-MEW |
| OMAGINE, INC., *et al.* | Chapter 11 |
| *Debtors.* | (Jointly Administered with Case No. 1:20-bk-10743-MEW) |

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.**

**ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISLCOSURE STATEMENT HAS BEEN APPROVED BY THE COURT.**

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.**

**PROPOSED FIFTH AMENDED DISCLOSURE STATEMENT FOR THE FIFTH AMENDED PLAN OF REORGANIZATION FOR OMAGINE, INC., AND JOURNEY OF LIGHT, INC.**

Filed by:

Omagine, Inc. and Journey of Light, Inc.
Debtors and Debtors in Possession

Attorneys for Debtors:

ROTBERT BUSINESS LAW P.C.
Mitchell J. Rotbert
9059 Shady Grove Court
Gaithersburg, Maryland 20877
Phone: (240) 477-4778
Fax: (888) 913-2307
mitch@rotbertlaw.com

## Disclaimer and Forward-Looking Statements

All Creditors and Holders of Interests are advised and encouraged to read this Disclosure Statement and the Plan in their entirety. Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the Exhibits to the Plan and this Disclosure Statement as a whole.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure and not in accordance with federal or state securities laws. This Disclosure Statement has neither been approved nor disapproved by the Securities and Exchange Commission ("SEC"), nor has the SEC passed on the accuracy or adequacy of this Disclosure Statement or the statements contained herein or in the Plan. This Disclosure Statement was prepared to provide Holders of Claims and Interests in Debtors with "adequate information" (as defined in the Bankruptcy Code) so that they can make an informed judgment about the Plan.

As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement shall not constitute nor be construed as an admission of any fact or liability, stipulation, or waiver, but rather as a statement made in settlement negotiations.

The information contained in this Disclosure Statement is included for the purpose of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to the Plan and how to vote on the Plan.

This Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving Debtors and any party, nor shall it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to Holders of Claims against, or Interests in, Debtors provided, however, that in the event Debtors default under the Plan, the Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default.

Some of the statements contained in this Disclosure Statement and the Plan that are not statements of historical facts constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, notwithstanding that such statements are not specifically identified as such. These forward-looking statements are based on current expectations and projections about future events that involve risks and uncertainties (such as any potential Recovery from the Oman Litigation or other future expectations mentioned in the Plan). Debtors urge all parties to be cautious of the forward-looking statements since such statements (i) reflect Debtors' current beliefs with respect to future events, (ii) involve, and are subject to, known and unknown risks, uncertainties and other factors affecting Debtors' operations and future growth strategy, and (iii) could cause the Debtors' actual results or financial performance or achievements to differ from future results, financial performance, or achievements expressed or implied by such forward-looking statements. Forecasts, projections and assumptions contained and expressed herein

and in the Plan were reasonably based on information available to the Debtors at the time so furnished and as of the date of this Disclosure Statement. All such forecasts, projections and assumptions are subject to significant uncertainties and contingencies, many of which are beyond the Debtors' control, and no assurance can be given that such forecasts, projections or assumptions will be realized. No assurances can be given regarding the achievement of future results, as Debtors' actual results may differ materially from Debtors' projected future results because of the risks Debtors face. Actual future events may differ from anticipated future events because of the assumptions underlying the forward-looking statements that have been made regarding such anticipated events. All parties are cautioned not to place undue reliance on any such forward-looking statements, which speak only as of the date hereof. Except as may be otherwise required by law, Debtors undertake no obligation to release any revisions to these forward-looking statements to reflect events or circumstances after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events.

The representations in this Disclosure Statement and in the Plan are those of Debtors. No representations concerning Debtors are authorized other than as set forth in this Disclosure Statement or the Plan. Any representations or inducements made to secure acceptance of the Plan other than as contained in this Disclosure Statement or the Plan should not be relied upon by any person. The information contained herein and, in the Plan, has not been subject to a certified audit. Debtors have exercised their best efforts however to provide adequate financial information in this Disclosure Statement and in the Plan. The representations by Debtors herein and in the Plan are not warranted or represented to be without any inaccuracy, although Debtors have exercised their best efforts to be accurate. Neither the Plan nor this Disclosure Statement has been designed to forecast consequences which follow from a general rejection of the Plan although an attempt is made to state the consequences of a liquidation of the Debtors.

## 1.    <u>Introduction and General Information.</u>

Omagine, Inc. ("Omagine") is a publicly traded Delaware corporation and Journey of Light, Inc. ("JOL") is a New York corporation and wholly-owned subsidiary of Omagine. Omagine and JOL are sometimes referred to herein collectively as the "Debtors." This disclosure statement dated June 27, 2022 ("Disclosure Statement") is submitted by the Debtors to provide information to parties in interest about the fifth amended Chapter 11 plan of reorganization dated June 27, 2022 (the "Plan") filed by Debtors.

This introductory Article is qualified in its entirety by the detailed explanations which follow and the provisions of the Plan.

This Disclosure Statement sets forth certain information regarding Debtors' pre-petition

history and events that have occurred during Debtors' Chapter 11 cases. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and the way Distributions, if any, will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and voting procedures that Holders of Claims in Impaired Classes must follow for their votes to be counted.

**PARTIES VOTING ON THE PLAN SHOULD READ BOTH THE PLAN AND THIS DISCLOSURE STATEMENT.**

**A.    Recommendation of the Plan Proponent**

In the opinion of Debtors, the Plan is the best available option for Creditors and Omagine Shareholders because it provides the possibility for the greatest, quickest and likely only possible Distribution to Creditors and leaves the Omagine Shareholders undisturbed and undiluted as the shareholders of Reorganized Omagine. Based on Proponent's lengthy experience in Oman and its assessment of what it believes to be the only alternative to the Plan, it is Proponent's opinion that a Chapter 7 liquidation of Debtors' de minimis assets as outlined in Article 10 hereof has little or no possibility for as likely or as large a Distribution for Creditors as does the Plan. Indeed, Debtors believe that there is virtually no possibility for any Distribution to be made to any Creditor absent the contingent possibility of a Recovery pursuant to the Oman Contract Case presently being pursued by BSA which litigation if successful in attaining a Recovery presents the possibility of a Distribution to the Creditors of all or a Pro-Rata Amount of their respective Allowed Claims. Notwithstanding the foregoing there can be no assurance given that any Recovery can be attained.

**B.    Definitions**

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan. In the event of an inconsistency between this Disclosure Statement and the Plan, the terms of the Plan shall govern and such inconsistency shall be resolved in favor of the Plan. As defined in the Plan, the Filing Date means March 10, 2020 and the Effective Date means the date that is thirty (30) calendar days after the entry of a final non-appealable Confirmation Order .

**C.    The Disclosure Statement**

The primary purpose of this Disclosure Statement is to provide parties entitled to vote on the Plan with adequate information so they can make a reasonably informed decision prior to exercising their right to vote to accept or reject the Plan.

The Bankruptcy Court's approval of this Disclosure Statement constitutes neither a guaranty of the accuracy or completeness of the information contained herein nor an endorsement of the Plan by the Bankruptcy Court.

When and if confirmed by the Bankruptcy Court, the Plan will bind Debtors and all Holders

of Claims against and Interests in Debtors whether or not such Holders of Claims and Interests are entitled to vote and whether or not they did vote to accept or reject the Plan and whether or not they receive or retain any Distributions or property under the Plan. Thus, you are encouraged to read this Disclosure Statement carefully. In particular, Holders of Impaired Claims who are entitled to vote on the Plan are encouraged to read this Disclosure Statement, the Plan, and the Exhibits to the Plan carefully and in their entirety before voting to accept or reject the Plan. This Disclosure Statement contains important information about the Plan, the method and manner of Distributions, if any, under the Plan, considerations pertinent to acceptance or rejection of the Plan and developments concerning the Bankruptcy Cases.

**2.    Voting on the Plan and Confirmation Process.**

**A.    Voting Instructions**

Accompanying this Disclosure Statement are copies of the following documents: (1) the Plan and (2) a Ballot to be executed by Holders of Claims or Interests entitled to vote to accept or reject the Plan. The Ballot contains voting instructions. Please read the instructions carefully to ensure that your vote will count. Specimen Ballots for each Class entitled to vote are attached to the Plan as Exhibits F-1; F-2 , F-3 and F-4.

This Disclosure Statement, the Plan and a Ballot delivered together herewith (collectively, the "Solicitation Package") is being furnished to each Holder of a Class 1, Class 2, Class 3 and Class 4 Claim entitled to vote for the purpose of soliciting votes on the Plan. This Disclosure Statement and the Plan (collectively, the "Omagine Shareholder Package") is being made available to the Omagine Shareholders who are the Holders of the Class 5 Equity Interests which are conclusively deemed to have accepted the Plan.

Omagine will give written notice by U.S. Mail to each Claim Holder in Class 1, Class 2, Class 3 and Class 4 (collectively, the "Impaired Classes") and such notice shall include (i) a full and complete copy of the Debtors' Fifth Amended Plan of Reorganization dated June 27, 2022 (the "Plan"), (ii) a full and complete copy of the Debtors Fifth Amended Disclosure Statement dated June 27, 2022 (the "Disclosure Statement"), the relevant orders issued by the Bankruptcy Court establishing the Bar Date and the Objection Deadline (the Court Orders") and (iii) the appropriate Ballot for the Class in which such Claim Holder's Claim is classified.

The only Unimpaired Class is Class 5 which consists exclusively of the 28,650,190 Common Shares issued and outstanding on the Filing Date and the date hereof. The Omagine Shareholders are the Holders of such 28,650,190 Common Shares. Under Section 1126(f) of the Bankruptcy Code a Class such as Class 5 which is not Impaired under the Plan and each Holder of a Class 5 Equity Interest is conclusively presumed to have accepted the Plan and solicitation of acceptances of the Plan with respect to such Class 5 Equity Interests from the Holders thereof is not required. Omagine will however give or cause to be given written

notice by U.S. Mail to the Omagine Shareholders via a Postcard (or electronically or otherwise via their respective Shareholder Nominee) with instructions where they may view and/or download the Omagine Shareholder Package on the internet at www.omagine.com.

If you did not receive a Ballot in your Solicitation Package and believe that you should have received a Ballot, please contact Rotbert Business Law P.C.; Attn.: Mitchell Rotbert; 9059 Shady Grove Court; Gaithersburg, Maryland 20877; Phone: (240) 477-4778; Fax: (888) 913-2307; Email: mitch@rotbertlaw.com .

For your Ballot to count, it must be received on or before the date indicated therefor on the Ballot and the Ballot must clearly indicate your Claim and the Class and amount of your Claim.

By enclosing a Ballot, neither Debtor is admitting that you are entitled to vote on the Plan or that your Claim or Interest is Allowed as set forth on the Ballot and neither Debtor is waiving any right to object to your vote or to your Claim or to your Interest.

**B.    Who May Vote**

Only a Holder of an Allowed Claim or Interest classified in an Impaired Class is entitled to vote on the Plan. As set forth in Section 1124 of the Bankruptcy Code, a class is "Impaired" if legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered.

Any class that is Unimpaired is not entitled to vote to accept or reject a plan of reorganization and is conclusively presumed to have accepted the Plan. Class 5 is the only Unimpaired Class under the Plan.

A Claim must be "Allowed" for purposes of voting in order for the Holder thereof to have the right to vote. Generally, for voting purposes a Claim is deemed "Allowed" absent an objection to the Claim if (1) a proof of claim was timely filed, or (ii) if no proof of claim was filed, the Claim is identified in Debtors' Schedules as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim is specified in the Schedules and the Claim is not otherwise barred by operation of law, in which case the Claim will be deemed Allowed for the specified amount. In either case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or allows the Claim for voting purposes.

Debtors in all events reserve the right through the claim reconciliation process to object to or seek to disallow any Claim for Distribution purposes under the Plan.

**C.    Requirements of Confirmation**

The Bankruptcy Court can confirm the Plan only if all the requirements of Section 1129 of the Bankruptcy Code are met. Those requirements include the following:

i.   The Plan classifies Claims and Interests in a permissible manner;

   ii.   If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider;

  iii.   The contents of the Plan comply with the technical requirements of the Bankruptcy Code;

  iv.   The Plan has been proposed in good faith and not by any means forbidden by law;

   v.   The disclosures concerning the Plan are adequate and include information concerning all payments made or promised in connection with the Plan, as well as the identity, affiliations, and compensation to be paid to all officers, directors, and other Insiders; and

  vi.   The principal purpose of the Plan is not the avoidance of tax or the avoidance of the securities laws of the United States.

In addition to the confirmation requirements described above, Debtors hope that the Plan will be approved by all Impaired Classes of Claims entitled to vote. If, however, the Plan has not been approved by all Impaired Classes of Claims, the Court may nevertheless "cram down" the Plan over the objections of a dissenting Class. The Plan may be "crammed down" so long as it does not discriminate unfairly, is fair and equitable with respect to each dissenting Class of Claims, and at least one Impaired Class has voted in favor of the Plan without regard to any votes of Insiders. If necessary, Debtors will seek to "cram down" the Plan.

**D.**    **Acceptance or Rejection of the Plan and Cram Down**

When determining if an Impaired Class has accepted the Plan, Votes by Insiders in such Class will be disregarded. Each of Class 1, Class 2, Class 3 and Class 4 is an Impaired Class of Claims. Class 5 is an Unimpaired Class of Equity Interests.

In determining and calculating the votes to accept or reject the Plan within each Impaired Class of Claims:

   i.   only the votes of those Persons who are Holders of Allowed Claims within an Impaired Class, and who are not Insiders and who vote to accept or reject the Plan (the "Voting Claim Holders") will be considered valid votes within such Impaired Class; and

  ii.   the aggregate USD amount of the Allowed Claims held by all such Voting Claim Holders within such Impaired Class (the "Aggregate USD Claim Amount") will be utilized in the calculation and tallying of the votes within such Impaired Class; and

  iii.   an Impaired Class will have accepted the Plan if the Plan is accepted by more than one-half in number of the Voting Claim Holders within such Impaired Class and at least two-thirds in amount of the Aggregate USD Claim Amount within such

Impaired Class as calculated pursuant the Plan.

In the event that one or more Impaired Class(es) do not accept the Plan, the Bankruptcy Court may still confirm the Plan if at least one Impaired Class accepts it and if, as to each Impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

If you hold an Allowed Claim not entitled to priority under Section 507 of the Bankruptcy Code, the Plan does not discriminate unfairly and is fair and equitable to you if all Holders within each Class of similar Claims are treated identically under the Plan, and

    i.    if you receive payment of an amount of money equal to your Allowed Claim, or

    ii.    if you receive payment of a Pro-Rata Amount of your Allowed Claim calculated by multiplying the Pool of funds designated to pay your Claim (the "Designated Pool") by a "Percentage" where such Percentage is calculated by dividing (x) the amount of your Allowed Claim by (y) the total amount of all Allowed Claims in the Designated Pool, or

    iii.    if no Holder of a Claim which is junior to your Claim (a "Junior Claim") receives or retains any payment in money or property under the Plan on account of such Junior Claim unless and until your Claim is paid in full.

If you are an Omagine Shareholder, the Plan does not discriminate unfairly and is fair and equitable to you since all Holders of the Class 5 Equity Interests are treated identically and equitably under the Plan. Class 5 consists exclusively of identical Equity Interests comprised of the 28,650,190 Outstanding Common Shares.

**E.**    **Delivery of the Solicitation Packages to the Omagine and JOL Creditors and the Shareholder Information Package to the Omagine Shareholders**

Each of Class 1, Class 3 and Class 4 is an Impaired Class and entitled to vote to accept or reject the Plan. Class 2 is also an Impaired Class and the Holders thereof are entitled to vote to accept or reject the Plan but since all four of such Class 2 Holders are Insiders, their votes and the aggregate amount of their Claims will be disregarded in determining whether or not to accept or reject the Plan. Since the JOL Shares are not being converted in any manner but are being surrendered and extinguished and no Class 4 Claims are being paid, Class 4 is an Impaired Class. The Holders of the Class 4 Claims are therefore deemed to have rejected the Plan and Omagine as the Holder of the JOL Shares and the Proponent of the Plan, is deemed to have accepted the Plan. Class 5 is an Unimpaired Class and the Holders of the Class 5 Equity Interests are conclusively presumed to have accepted the Plan.

As a condition to confirmation of the Plan, the Bankruptcy Code requires that one Class of Impaired Claims votes to accept the Plan. Section 1126(c) of the Bankruptcy Code defines acceptance of the Plan by a Class of Impaired Claims as acceptance by Holders of (i) at least two-thirds of the dollar amount of the Class, and (ii) more than one-half in number of Claims

in the Class. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code a Class is deemed not to have accepted a Plan if such Plan provides that the Claims or Interests of such class do not entitle the Holders of such Claims or Interests to receive or retain any property under the Plan on account of such Claims or Interests.

When determining if an Impaired Class has accepted the Plan, Votes by Insiders in such Class will be disregarded. Each of Class 1, Class 2, Class 3 and Class 4 is an Impaired Class of Claims. Class 5 is an Unimpaired Class of Equity Interests.

In determining and calculating the votes to accept or reject the Plan within each Impaired Class of Claims:

    i. only the votes of those Persons who are Holders of Allowed Claims within an Impaired Class, and who are not Insiders and who vote to accept or reject the Plan (the "Voting Claim Holders") will be considered valid votes within such Impaired Class; and

    ii. the aggregate USD amount of the Allowed Claims held by all such Voting Claim Holders within such Impaired Class (the "Aggregate USD Claim Amount") will be utilized in the calculation and tallying of the votes within such Impaired Class; and

    iii. an Impaired Class will have accepted the Plan if the Plan is accepted by more than one-half in number of the Voting Claim Holders within such Impaired Class and at least two-thirds in amount of the Aggregate USD Claim Amount within such Impaired Class.

Voting is accomplished by Holders of Claims completing, dating, signing and returning their Ballots by the Voting Deadline. Ballots will be distributed to all Creditors entitled to vote on the Plan and a Ballot is part of the Solicitation Package accompanying the Disclosure Statement. The Ballot indicates the Voting Deadline and where the completed Ballot is to be returned.

Each of Class 1, Class 2, Class 3 and Class 4 are Impaired Classes. Holders of Claims in Impaired Classes are entitled to vote to accept or reject the Plan. Distribution of Solicitation Packages shall be made by Omagine via first class U.S. Mail to each Claim Holder in such Impaired Classes at the Record Address for such Claim Holder.

Class 5 is an Unimpaired Class. The Holders of the Class 5 Equity Interests are the Certificated Shareholders and the Street Name Shareholders, which together constitute all the Omagine Shareholders.

No transfer of any Certificated Shares has occurred or been registered in Omagine's stock register after December 2018 when the Transfer Agent ceased registering transfers of Certificated Shares and no transfer of any Certificated Shares will occur until the

Compliance Activities are accomplished subsequent to the Recovery Date.

Exhibit O to the Plan memorializes the ownership of all 28,650,190 Outstanding Omagine Shares as of the date hereof, as follows:

    i.    10,556,599 Certificated Shares are owned by 122 Certificated Shareholders, and

    ii.    18,093,551 Street Name Shares held in the name of Shareholder Nominees are beneficially owned by an estimated 800 Street Name Shareholders.

Notwithstanding the foregoing ownership information, (i) while it is certain that the 10,556,599 Certificated Shares include 100% of the Certificated Shares, it is possible that some Street Name Shares are also included in that number and (ii) while it is also certain that the 122 Certificated Shareholders includes 100% of the Certificated Shareholders it is also possible that some Street Name Shareholders are also included in that number, and (iii) a number of Omagine Shareholders own both Certificated Shares directly and Street Name Shares indirectly and beneficially via Shareholder Nominees, and (iv) because of the churn of purchases and sales of Common Shares in the public markets, the estimated number of Street Name Shareholders is constantly changing and is always only captured as of a specific "record date" which Omagine will set as close as possible to the designated mailing date for the Postcards. Moreover some beneficial owners of Street Name Shares (the "Objecting Beneficial Owners") specifically instruct their Shareholder Nominees (who in turn instruct Broadridge) to (a) only disclose the names and contact details of such Objecting Beneficial Owners as required by relevant law or regulatory authorities, and/or (b) strictly limit any shareholder communications with such Objecting Beneficial Owners, and/or (c) only contact such Objecting Beneficial Owners electronically with respect to any shareholder communications.

Broadridge is a well-known and established financial services company that assembles data on the identities of Street Name Shareholders and the ownership positions of Street Name Shares for many publicly traded companies, including Omagine. Broadridge is regularly employed by publicly traded companies to conduct SEC compliant communications, mailings and notifications to Street Name Shareholders and Broadridge has done so several times in the past on behalf of Omagine.

Omagine will cause the Plan, the Exhibits to the Plan, the Disclosure Statement, the Bar Date, the Objection Deadline and other important information about the Bankruptcy Cases to be made available to the Omagine Shareholders for their review via notification to them (the "Shareholder Notice") of Omagine's internet website (www.omagine.com) where they may view and/or download the complete Shareholder Information Package. Such Shareholder Notice will be accomplished as follows:

    i.    Omagine will mail a Postcard (the form of which is attached to the Plan as Exhibit P) to each of the Certificated Shareholders via the U.S. Mail (or via email if so requested by any such Omagine Shareholder), and

ii.    Omagine will employ Broadridge to mail a Postcard to the Street Name Shareholders who are Non-Objecting Beneficial Owners  (or via email if so requested by any such Street Name Shareholder), and

iii.    Broadridge shall send the Postcard by electronic or other means to the Street Name Shareholders who are Objecting Beneficial Owners who have instructed their relevant Shareholder Nominee to communicate with them via electronic or other means.

**F.    Confirmation Hearing**

The Bankruptcy Court has scheduled a hearing on confirmation of the Plan ("Confirmation Hearing") at the time indicated in the Order Approving this Disclosure Statement and providing Notice of Confirmation Hearing (the "Solicitation Order"). The Confirmation Hearing may be adjourned from time to time without further notice except for announcement at the Confirmation Hearing or notice to those parties present at the Confirmation Hearing.

**G.    Objections to Confirmation**

As will be set forth in the Solicitation Order, any objections to confirmation of the Plan must be in writing, set forth the objector's standing to assert any such objection, and must be filed with the Bankruptcy Court and served on counsel for Debtors. The Solicitation Order contains all relevant procedures relating to the submission of objections to confirmation and should be reviewed in its entirety by any party who has an objection to confirmation.

**H.    Who to Contact for More Information**

If you have any questions about the procedure for voting on your Claim or on the Solicitation Package you received by mail, please contact Rotbert Business Law P.C. at the address indicated below or by telephone at (240) 477-4778.

If you wish to obtain additional copies of the Plan, the Exhibits to the Plan or this Disclosure Statement at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact Rotbert Business Law P.C. by U.S mail or via facsimile or email at:

Rotbert Business Law P.C.

Attn. Mr. Mitchell J. Rotbert

9059 Shady Grove Court

Gaithersburg, Maryland 20877

Tel.: (240) 477-4778

Fax: (888) 913-2307

Email address: mitch@rotbertlaw.com

**3    Historical Background.**

**A.    Description of Debtors and its Current Management**

Omagine is a holding company focused on entertainment, hospitality and real estate

development opportunities in the Middle East and North Africa and on the design and development of distinctive tourism and residential destinations. The Company had concentrated the majority of its efforts on the business of its majority owned (60%) subsidiary, Omagine LLC, an Omani limited liability company("Omagine-Oman") and specifically on the development of the Omagine Project which is a $2.6 billion dollar mixed-use tourism and residential real estate project in the Sultanate of Oman. Debtors' operations and history are further described in the below Articles of this Disclosure Statement.

The Debtors presently have no employees. The president of Omagine, Frank J. Drohan (on a near full-time basis), and the Vice-President of Omagine, Charles P. Kuczynski, the former Controller of Omagine, Mr. William Hanley and the former Deputy Managing Director of Omagine-Oman, Mr. Sam Hamdan (on an as needed or required basis) have managed Omagine's affairs as consultants to Omagine for the past many years and through the default by and negotiations with the office of Royal Court Affairs of Oman ("RCA") up to the present time. Mr. Drohan and Mr. Kuczynski are presently willing to continue as consultants to the Debtors and to continue to manage its affairs as needed during these Bankruptcy Cases and up to a Conclusion of the Oman Contract Case and Mr. Hanley and Mr. Hamdan are presently willing to use their best efforts to provide consultancy services to the Debtors as and when required or requested by Mr. Drohan. Notwithstanding the foregoing sentence however, each of Drohan, Kuczynski, Hanley and Hamdan may, in their sole and exclusive discretion, discontinue such consulting services to Debtors at any time and for any reason or for no reason. Depending upon their personal circumstances at the time, either or both of Mr. Drohan and/or Mr. Kuczynski may rejoin Reorganized Omagine as employees after a Conclusion to the Oman Contract Case is attained in order to conduct Reorganized Omagine's then ongoing and future business. Following are brief summaries of the Insider Consultant's background and experience:

Frank J. Drohan has served as a director, Chairman of the Board of Directors, President and CEO of Omagine since 1991. Mr. Drohan is also the Managing Director and Chief Executive Officer of Omagine LLC (Omagine-Oman) and he serves as a director and the chairman of JOL He was chairman of the board of directors, president and sole shareholder of Rif International Corp., a privately held company active in the construction and real estate development business and which had extensive overseas activities in the Middle East and North Africa between 1977 and 1986 and which was acquired by Omagine in 1997. Mr. Drohan holds a Bachelor of Science degree in Economics and Political Science from Manhattan College in New York City. He has over 40 years of experience doing business across most of the Middle East, has many long-standing business and personal relationships in the region and is familiar with the region's cultural and business environment.

Charles P. Kuczynski has served as a director, Secretary and a Vice-President of Omagine since 1996 and previously served as a director and Secretary of Omagine from 1988 to 1993. Mr. Kuczynski is a director and the secretary of JOL. Prior to joining Omagine, Mr.

Kuczynski was a sales executive with Hillenbrand Industries. Mr. Kuczynski holds a Bachelor of Arts degree from Merrimack College in Massachusetts and he has over 35 years of diverse business experience in marketing, sales, public relations and administration.

William Hanley has served as the Controller and Principal Accounting Officer of Debtors since January 2008. Mr. Hanley served as the controller of Mittal Steel from 1986 to 2007 and as the Controller and Chief Financial Officer of Rif International Corp. from 1980 to 1986. From 1973 to 1980 he served as the controller at two Wall Street brokerage firms and from 1968 to 1972 as a senior accountant at Main LaFrentz & Company. Mr. Hanley holds a Bachelor of Business Administration degree in Accounting from St. Francis College in New York.

Sam Hamdan has over 30 years of experience in the Middle East, is familiar with the region's cultural and business environment, is fluent in Arabic and English, and was Omagine's primary strategic consultant. Mr. Hamdan has many long-standing relationships with senior level business executives and government officials in the U.S. and Middle East. He was also the Deputy Managing Director of Omagine's 60% owned subsidiary, Omagine LLC, where he participated in the then ongoing negotiations in Oman with RCA, other potential investors and the Oman Government.

**B.     Description of Debtors' Historical, Current and Potential Future Operations**

In 2009, Omagine organized Omagine-Oman as its 100% owned Omani subsidiary to be the developer of the Omagine Project in Oman.

The Omagine Project was planned by Omagine to be a mixed-use tourism and residential real estate project developed on a one million square meter plot (approximately 245 acres) of prime beachfront land (the "Project Land") facing the Gulf of Oman just west of Oman's capital city of Muscat and approximately three miles from Muscat International Airport.

Omagine's development plans envisioned an elegant integration of cultural, scientific, heritage, entertainment and residential components, including seven pearl shaped (20 meter diameter) buildings (the "Pearls") located along an open boardwalk with associated entertainment exhibitions; an amphitheater and stage; green landscaped spaces; a canal; an enclosed harbor and marina; boat slips and docking facilities; retail shops; a variety of restaurants, cafes and entertainment venues; a five-star resort hotel; a four-star hotel; and possibly an additional three or four-star hotel; shopping and retail establishments integrated with the hotels; commercial office buildings; and more than two thousand elegant residences to be developed for sale.

The Omagine Project was projected to generate approximately $3 billion U.S dollars ("USD") in net free cash flow for Omagine-Oman.

The Office of Royal Court Affairs of Oman ("RCA") is an Omani entity representing the personal interests of Oman's ruler, His Majesty the Sultan of Oman.

In 2011 Omagine's 100% ownership of Omagine-Oman was reduced to 60% pursuant to a "Shareholder Agreement" executed by, among others, RCA and Debtors.

The Project Land was owned by Oman's then ruler, His Majesty Sultan Qaboos bin Said Al Said. Pursuant to the terms of the Shareholder Agreement and the RCA Subscription Agreement, both of which were executed by RCA in April 2011, RCA agreed to provide the Project Land to Omagine-Oman via an agreement with the Oman Government (the "Usufruct Agreement") which would grant Omagine-Oman extensive rights over the Project Land (the "Land Rights").

In October 2014, Omagine-Oman and the Government of Oman signed a Development Agreement ("DA") for the development in Oman by Omagine-Oman of the Omagine Project.

In July 2015, the Usufruct Agreement memorializing the Land Rights was registered and recorded at the Ministry of Housing of the Government of Oman.

In July 2016, RCA became obligated pursuant to the terms of the Shareholder Agreement and the RCA Subscription Agreement, both of which were executed by RCA in April 2011, to invest $20 million in cash into Omagine-Oman.

Title to the Project Land was thereafter transferred from RCA via a Royal Decree of Sultan Qaboos to the Oman government's Ministry of Tourism ("MOT") with the proviso that the Project Land would be used to develop the Omagine Project. The MOT signed the DA with Omagine-Oman in October 2014, pursuant to which, among other things, the MOT signed the Usufruct Agreement in July 2015 with Omagine-Oman granting the Land Rights to Omagine-Oman. The Usufruct Agreement was registered in July 2015 with the Ministry of Housing of Oman thereby legally enforcing and memorializing ownership of the Land Rights by Omagine-Oman. Three (3) internationally recognized land valuation firms were subsequently engaged to professionally value the Land Rights and the average valuation of such Land Rights was determined to be seven hundred eighteen million six hundred fourteen thousand USD ($718,614,000).

PriceWaterhouseCoopers LLP ("PWC") was engaged in June 2015 to advise Omagine-Oman on the correct accounting treatment in accordance with International Financial Reporting Standards ("IFRS") for the valuation of the Land Rights to the Project Land. PWC delivered its written report dated August 31, 2015 (the "PWC Report") to Omagine-Oman. Deloitte & Touche (M.E.) & Co. LLC ("Deloitte"), Omagine-Oman's independent auditing firm, opined on the PWC Report in their advice memo dated November 16, 2015 agreeing with the PWC Report's conclusions with respect to the correct IFRS accounting treatment for the valuation of the Land Rights to the Project Land. Pursuant to the PWC Report and the Deloitte advice the $718,614,000 valuation of the Land Rights to the Project Land was booked on the Omagine-Oman balance sheet in November 2015. Thereafter, with the advice and consent of Omagine's independent U.S. auditing firm and in accordance with

accounting principles generally accepted in the United States, the appropriate 60% amount of such Land Rights valuation was also reflected in Omagine's 2016 annual audited financial statement and its first three quarterly unaudited consolidated financial statements for 2017.

As more fully described in Exhibit L to the Plan therefore, in March 2018 in deference to the uncertainty surrounding RCA's continuing unresolved default, the amount of the Land Rights valuation previously booked on Omagine's consolidated financial statement was fully reserved as of December 31, 2017 and written down to zero.

 Numerous negotiations involving RCA and others from mid-2016 through early 2019 failed to resolve RCA's $20 million default under the Shareholder Agreement. Despite Omagine conducting almost two and one-half (2½) years of intensive negotiations with RCA from July 2016 to February 2019 including:

a.    numerous meetings and negotiations and travel to and with RCA; and

b.    giving multiple written and verbal notices to RCA; and

c.    sending, at RCA's request, numerous letters & reports to RCA; and

d.    re-sending to RCA, again at RCA's request, the identical letters & reports previously sent to RCA; and

e.    reluctantly undertaking sole responsibility for the ongoing continued financing of Omagine-Oman on which by February 2019 Omagine had expended over thirty million USD ($30,000,000); and

f.    receiving numerous assurances and promises of a resolution from RCA;

nevertheless, RCA defaulted on its $20 million investment obligation and such default continues as of the date hereof.

RCA's breach of its obligations under the Shareholder Agreement was regularly mentioned and questioned by potential Omagine investors and local and foreign banks during meetings and negotiations with Omagine. Such RCA default was the direct cause of Omagine-Oman's inability to continue the development of the Omagine Project and to continue as a going concern. RCA's breach of its obligations under the Shareholder Agreement and its default on its $20 million investment obligation was the ***direct cause*** of the write-down to zero of Omagine's Land Rights valuation and ultimately of Omagine's Chapter 11 bankruptcy filing.

The litigation of the Oman Contract Case was initially undertaken in March 2019 by Omagine in the U.S. District Court for the Southern District of New York (Case No. 1:19-cv-02695) and the case was thereafter transferred in April 2019 to the U.S. District Court for the District of Columbia (Case No. 1:19-cv-01073-CJN ) where, pursuant to Omagine's voluntary notice of dismissal filed on March 3, 2020, such litigation was voluntarily dismissed without prejudice so that Omagine could then pursue the Oman Contract Case in the courts of Oman. Omagine is represented in Oman by Al Rashdi & Al Barwani Advocates & Legal

Consultants ("BSA). On March 10, 2020 Omagine filed its Chapter 11 petition in the Bankruptcy Court and in December 2021 Omagine paid BSA the $50,000 advance fee required by the BSA Engagement Agreement and BSA initiated the Oman Contract Case which is presently ongoing in the courts of Oman located in Muscat, Oman.

In January 2020 Sultan Qaboos passed away after a lengthy illness of several years. He was succeeded as ruler of Oman by his cousin, the present ruler of Oman, His Majesty Sultan Haitham bin Tariq Al Said. To the best of Omagine's knowledge and belief, sometime thereafter during 2020 or 2021 a government reorganization was undertaken in Oman wherein the Ministry of Tourism was eliminated and its activities were consolidated into the Ministry of Cultural Affairs headed by Sultan Haitham's son, the present Crown Prince of Oman. Omagine is unaware of the precise present status of the Omagine Project, the DA, the Usufruct Agreement or the Project Land.

The net-present-value (NPV) of the Omagine Project's $3 billion of projected cash flow (as calculated in January 2017) was approximately $1.6 billion USD and, absent RCA's default and breach, sixty percent (60%) of that NPV (or approximately $900 million) would therefore have accrued to Omagine. Omagine and Omagine-Oman have given several written and verbal notices to RCA (both directly and via Omagine's prior legal counsel in New York and Dubai) that RCA's $20 million equity investment obligation is past due and owing but to date RCA has never responded nor paid its $20 million obligation.

The sole issue that prevented the continued development of the Omagine Project is the default since July 2016 by RCA of its obligation to invest its $20 million of equity into Omagine-Oman which RCA is obligated to do pursuant to the Shareholder Agreement. Omagine has fulfilled 100% of its (and some of RCA's) obligations under the Shareholder Agreement. The Shareholder Agreement is a legally binding agreement as between Omagine and RCA and is governed by Omani Law. Furthermore, as a U.S. company, Omagine falls under the 2009 U.S.-Oman Free Trade Agreement ("FTA") which among other things guarantees the fair and equal treatment of U.S. investors in Oman and of Omani investors in the U.S.

Omagine is represented in Oman by BSA, a Muscat based law firm. Debtors presently have no ongoing business operations except the prosecution in Oman of the Oman Contract Case which is ongoing with the assistance of BSA. Pursuant to the BSA Engagement Agreement between BSA and Omagine, BSA's ongoing litigation and legal representation efforts are fully funded after the $50,000 BSA advance payment to BSA was made by Omagine in December 2021. The balance, if any, of BSA's compensation will be covered by a contingency fee as more fully described in the BSA Engagement Agreement attached to the Plan as Exhibit H.

For a more detailed discussion of Debtors' operations, history and financial condition after the March 10, 2020 Filing Date interested parties may refer to Omagine's filings with the Bankruptcy Court, including Debtors' regular monthly reports filed with the U.S. Trustee,

all of which filings are available on the Public Access to Court Electronic Records (PACER) website which is a service of the federal Judiciary. Public access to PACER is available at the following internet hyperlink:

https://pacer.uscourts.gov/register-account/pacer-case-search-only

For a more detailed discussion of Debtors' operations, history and financial condition before the March 10, 2020 Filing Date, interested parties may refer to Exhibit L to the Plan and other of Omagine's reports filed with the SEC, the most recent of which filed reports are available at the following internet hyperlinks:

https://www.sec.gov/Archives/edgar/data/820600/000121390018003726/extf10k2017_omagineinc.htm

https://www.sec.gov/Archives/edgar/data/820600/000121390017012389/f10q0917_omagineinc.htm

https://www.sec.gov/Archives/edgar/data/820600/000121390017003771/f10k2016_omagineinc.htm

The Plan contemplates that the Oman Litigation will infuse funds via a Recovery into Reorganized Omagine thereby funding the Plan. The successful funding of the Plan and payment of the Allowed Claims under the Plan is entirely contingent upon the amount of a Recovery – if any – obtained at the Conclusion of the Oman Contract Case.

Provided a sufficient Recovery is attained, Mr. Drohan and Mr. Kuczynski have agreed to rejoin Omagine as employees in order to either re-start and conduct its previous business or to identify and engage Omagine in a new line of business. Pursuant to the Plan, JOL will cease its independent existence by being merged with and into Omagine.

Subsequent to the Filing Date and with the approval of the Bankruptcy Court, Omagine became a party to the following contractual agreements: the BSA Engagement Agreement, the RBL Engagement Agreement, the Al-Sada Promissory Note and the Grossman Promissory Note, all of which agreements will be assumed by Reorganized Omagine on or after the Effective Date.

It is planned that Mr. Frank Drohan will be the President, Chief Executive Officer and Chief Financial Officer of Reorganized Omagine and Mr. Charles Kuczynski will be the Vice-President and Secretary of Reorganized Omagine. Mr. Drohan and Mr. Kuczynski will be the sole directors of Reorganized Omagine and Mr. Drohan will be the Chairman of the Board of Directors and they will oversee the management of the business affairs of Reorganized Omagine after the Confirmation Date.

## C.    Debtors' Assets and Liabilities

In a March 30, 2018 public filing with the SEC attached as Exhibit L to the Plan, and in all of its monthly reports filed with the U.S. Trustee and the Bankruptcy Court through the date

hereof, the Proponent has reported the de minimis nature of its assets.

As of September 30, 2017, Omagine had made all of its required cash capital investments into Omagine-Oman totaling $780,000 and the 40% shareholders (RCA and Consolidated Contractors Company) had made only their 2011 initial cash capital investments into Omagine-Oman totaling $156,000 (the "Non-Omagine Capital Investments").

In addition, as of September 30, 2017, Omagine had:

> i.   made cash loans to Omagine-Oman totaling $5,530,763;
>
> ii.  paid expenses on behalf of Omagine-Oman totaling $13,611,951; and
>
> iii. incurred $11,853,019 of non-cash expenses on behalf of Omagine-Oman,

and further as of September 30, 2017, RCA and Consolidated Contractors Company ("CCC"), had:

> i.   made no investments into Omagine-Oman other than the nominal Non-Omagine Capital Investment they made in 2011 when they executed the Shareholder Agreement;
>
> ii.  made no cash loans or advances to Omagine-Oman; and
>
> iii. paid no expenses on behalf of Omagine-Oman.

Omagine-Oman was financed and supported solely by Omagine from May 2011 forward. The value of Omagine's 60% ownership stake in Omagine-Oman was fully reserved by Omagine's management and accountants in March 2018 concurrent with the value of the Land Rights being fully reserved (See Exhibit L to the Plan).

As of the Filing Date JOL had no assets and Omagine had fully depreciated office & computer equipment with an original value of $152,292 and a present value of zero; a $2,287 prepaid legal retainer which has been fully utilized as of the date hereof, a $327 prepaid fee deposit at the SEC and $55 in its bank account (which balance was replenished from time to time by Mr. Drohan until the receipt in December 2021 by Omagine of the Post-Petition Financing). Omagine recently purchased computer equipment for $1,212.82 which as of the date hereof has a depreciated value of $1,179.13.

Omagine retains ownership of its 60% equity interest in Omagine-Oman but given the present state of affairs with the delays and uncertainties surrounding the Omagine Project caused by RCA's default, and economic turbulence in Oman from, among other things, financial and budgetary constraints, oil price shocks, regional political tensions, the death of Sultan Qaboos, the coronavirus pandemic, social and economic disruptions and the prior and impending litigation with RCA; Omagine is of the opinion that, other than its possible use in the Oman Litigation as a possible component of a possible settlement with RCA, the value to Omagine's 60% ownership of Omagine-Oman is zero as of the date hereof.

Omagine filed trademark applications with the United States Patent and Trademark Office ("USPTO") for the mark OMAGINE and six related marks (collectively, the "Marks"). Omagine has also filed trademark applications for the Marks in Oman and Kuwait within the applicable time periods required.

The Mark OMAGINE and three of the six related Marks have each been issued a Certificate of Registration from the USPTO and are now officially registered Marks in the United States (the "Registered Marks"). Under USPTO rules continuous commercial use of the Registered Marks over the previous five year period were required to maintain valid registrations for such Registered Marks. Due to the aforementioned delays encountered by Omagine because of the RCA default, the Registered Marks have not been continuously used and therefore such Registered Marks will likely not be maintained by the USPTO.

The USPTO issued a "Notice of Allowance" with respect to each of the remaining three related Marks (the "Expired Marks") and the applications for such Expired Marks could have been approved for registration upon the filing of a valid "Statement of Use" attesting that each such Expired Mark was in commercial use. Due to the delays encountered by Omagine because of the RCA default, the Expired Marks were not put into commercial use by the "Final Statement of Use Deadline" and all three applications for the Expired Marks have expired.

Trademark applications for the OMAGINE Mark and eight related Marks were filed in Oman and all were issued Certificates of Registration in Oman. As of the date hereof management deems it unlikely but is unaware if the registrations in Oman for the Oman Marks remain valid or in force. The Mark OMAGINE has been issued a Registration Certificate from the Patent and Trademark Department of the Ministry of Commerce & Industry in Kuwait and as of the date hereof management deems it unlikely but is unaware if such Kuwait registration remains valid and in force as of the date hereof.

Given the present state of affairs with the delays to the Omagine Project caused by RCA's default and the prior and impending litigation with RCA, Omagine is of the opinion that, other than their possible use in the Oman Litigation as a part of a settlement with RCA, the value to Omagine of such trademarks is zero.

Omagine recently calculated its pre-petition liabilities to be a total of $3,470,585 and JOL's pre-petition liabilities to be a total of $90,250. Information with respect to Debtors' assets and liabilities was taken from Debtors' Schedules and Monthly Trustee Reports.

**4**     **The Chapter 11 Case.**

**A.**     **Reasons for Filing Chapter 11**

The direct circumstance that led to Debtors' Chapter 11 filing is the ongoing July 2016 breach of contract by the office of Royal Court Affairs in Oman when RCA failed to make its required $20 million investment into Omagine-Oman and the extensive period of fruitless

negotiations following such date (all of which were further complicated and delayed by the ongoing turmoil from the events surrounding the worldwide financial crisis, the sudden and dramatic drop in the world price of crude oil, the Arab Spring, and the ongoing extended illness of the then ruler of Oman, Sultan Qaboos.

In March 2019 Omagine filed a lawsuit in the Federal District Court for the Southern District of New York ("SDNY") seeking damages against RCA in respect of the matters discussed in this Disclosure Statement (Case Number 1:19-cv-02695). In April 2019 SDNY transferred the case (the "RCA Case") to the Federal District Court for the District of Columbia [the "DC Court"] (Case Number 1:19-cv-01073-CJN). Subsequently Omagine decided to pursue the RCA Case first in the Courts of Oman and if necessary, return thereafter to the SDNY. On March 2, 2020 Omagine filed with the DC Court a notice of voluntary dismissal of the case without prejudice and the RCA Case therefore has not yet been decided by or tried in the DC Court.

On the Filing Date there was a pending civil action filed against Debtors in the United States District Court for the District of Massachusetts (the Massachusetts Court") in a case styled _Auctus Fund, LLC et al v. Omagine, Inc. et al_ (Case Number 1:19-cv-10700-GAO) brought by two Class 2 Omagine Unsecured Creditors. Omagine did not have the financial resources to engage lawyers to defend itself in this case and consequently did not do so. Debtors filed these Bankruptcy Cases in the Bankruptcy Court on March 10, 2010 and the aforementioned case in the Massachusetts Court against Debtors was automatically stayed.

## B.    Professionals

Rotbert Business Law, P.C. ("RBL") is **a** law firm with offices in Gaithersburg, Maryland, Washington, DC and New York City. BSA Al Rashdi & Al Barwani Advocates & Legal Consultants ("BSA") is an Oman**i** law firm with offices in Muscat, Oman and licensed to practice law before the courts in Oman. Omagine has executed and delivered (i) the RBL Engagement Agreement with RBL (Exhibit G to the Plan) covering legal services during the Bankruptcy Cases and advisory and consulting services during the Oman Contract Case, and (ii) the BSA Engagement Agreement with BSA (Exhibit H to the Plan) covering legal services during the Oman Contract Case. The Bankruptcy Court has approved both the RBL Engagement Agreement and the BSA Engagement Agreement.

## C.    Insider Consultants; Deferred Payments

The Insider Consultants are Drohan, Hamdan, Hanley and Kuczynski. Debtors intend to continue to utilize the consulting services of the Insider Consultants as needed during the pendency of these Bankruptcy Cases and the Oman Contract Case.

Omagine's president, Frank Drohan, secured the services of BSA and conducted the negotiations with BSA which concluded with the BSA Engagement Agreement. Drohan and Kuczynski also secured the Post-Petition Funders and negotiated and arranged for the fifty five thousand USD ($55,000) of post-petition financing approved by the Bankruptcy Court

of which $50,000 was paid by Omagine to BSA pursuant to the BSA Engagement Agreement and the balance of which was retained by Omagine to defray its post-petition expenses.

During the pendency of the Bankruptcy Cases and the Oman Litigation it is expected that Mr. Drohan will dedicate the majority of his time and efforts to Debtors' affairs; that Mr. Kuczynski, Omagine's Vice-President, will dedicate a lesser portion (but not a majority portion) of his time and efforts to Debtors' affairs; that Mr. Hamdan, Omagine-Oman's former Deputy Managing Director, will dedicate a modest amount of his time and efforts to the Bankruptcy Case but may dedicate a larger amount of his time and efforts to the Oman Contract Case; and that Mr. Hanley, Omagine's former Controller and Chief Accounting Officer, will dedicate a minimal amount of his time and efforts to Debtors' affairs. Notwithstanding the foregoing and since it is difficult to predict with any accuracy the amount of future time and effort that will be required from any of the Insider Consultants during the pendency of the Bankruptcy Cases and the Oman Contract Case, Mr. Drohan, at his discretion, intends to cause Omagine to engage with Kuczynski, Hamdan and Hanley as Mr. Drohan deems necessary.

Each Insider Consultant has agreed to the following deferred payment terms with respect to the Insider Consultant Claims which payment terms are other than as prescribed in the Bankruptcy Code for such Administrative Expense Claims:

      i.    to defer payment of his relevant Insider Consultant Claim until after all other Administrative Expense Claims and Creditor Claims under the Plan other than the BSA Excess Expenses Claim have been paid in full, and

     ii.    if Pool 5 is an Insufficient Funds Pool, to accept a Pro-Rata Amount in full satisfaction of his respective Insider Consultant Claim, and

   iii.    if there is an Adverse Conclusion resulting in no Recovery, to waive payment of his respective Insider Consultant Claim.

**D.    Reorganized Omagine Shareholders**

The Holders of the Outstanding Common Shares will continue to be the shareholders of Reorganized Omagine on the Effective Date.

**E.    Post Filing Date Operations**

Debtors have had no ongoing operations of any consequence since December 2018 as they have sought a settlement agreement with RCA and/or to litigate the Oman Litigation Claim first in the U.S. federal courts and now in the Omani courts. This situation did not change after the Filing Date as indicated by the monthly operating reports which reflect operating losses and no ongoing business operations other than the pursuit of the Oman Contract Case and management of these Bankruptcy Cases.

Debtors seek an order under Section 105 of the Bankruptcy Code and Rule 3002(c)(3) of the Federal Rules of Bankruptcy Procedure establishing July 26, 2022 as the deadline for

Creditors and parties-in-interest to file proofs of claim in these Bankruptcy Cases.

The order and notice setting July 26, 2022 as the Bar Date which is the last date to file proofs of claim will be issued or published as allowed by the Bankruptcy Court.

As of the date hereof, a proof of claim for $5,194.83 (the "Second Estimated NYS Claim") has been filed with the Bankruptcy Court by the State of New York (See: Article 8.2 hereof). The Second Estimated NYS Claim is not for taxes but for pre-petition interest and penalties as estimated by NY State and purported to be owed by Omagine. For the reasons more fully described in Article 8.2 hereof and Section 5.2 of the Plan, Omagine is of the opinion that no such amount is owing to NY State. Omagine filed an objection to the foregoing alleged NYS Claim with the Bankruptcy Court in order to definitively resolve this matter and Omagine expects that such resolution will result in no such estimated amount being due or owing to NYS. Notwithstanding the foregoing sentence, Omagine intends to pay in accordance with the provisions of the Bankruptcy Code any amount determined to be an Allowed Claim owing to NY State (a "NYS Allowed Claim").

Omagine's pre-petition liabilities contain an accrued amount payable to the State of Delaware for estimated pre-petition Delaware franchise tax due (the "Delaware Franchise Tax") but this estimated amount is uncertain and the State of Delaware has made no claim with respect thereto. Omagine has contacted the Delaware state tax department and was advised by its personnel that Omagine should file any franchise tax returns and pay any amounts that may be determined to be due after the Three Cases are resolved. The Delaware Franchise Tax Claim is an estimate by Omagine for pre-petition Delaware franchise tax which Omagine intends to calculate precisely and pay pursuant to this Plan in accordance with its agreement with the Delaware state tax department.

All monthly operating reports filed with the Bankruptcy Court by Debtors since the Filing Date can be located on the PACER website referred to above or you may contact RBL at the address given above to obtain copies of the monthly operating reports. These reports reflect that Debtors are not profitable, realizing losses each month since the Filing Date (and a total accumulated loss during the 22 month period from the Filing Date through December 31, 2021 of $378,868) primarily due to (i) $50,000 of legal fees and expenses which was paid to BSA from the proceeds of the $55,000 of Post-Petition Financing supplied to Omagine by the Post-Petition Funders, (ii) $11,382 of miscellaneous post-petition expenses of which $6,704 (59%) were paid by Frank Drohan, and (iii) $317,486 of accrued Insider Consulting Fees. Of the foregoing (i) and (ii) have been paid and (ii) – the $317,486 of accrued Insider Consulting Fees - will only be paid if and when a sufficient Recovery occurs, and then only after all Administrative and Creditor Claims have first been paid in full. Debtors continue to receive the labor and guidance of the Exculpated Persons including work in Oman by them on the Oman Contract Case.

**5        Summary of the Plan.**

There are no Secured Claims against either Debtor. Other than the Common Stock, there is no other class of Omagine capital stock issued or outstanding. Omagine owns the JOL Shares.

All Claims against the Debtors, of whatever nature, whether or not scheduled or liquidated, absolute or contingent, Allowed or not, and Interests shall be bound by the provisions of the Plan and all such Claims and Interests are classified as follows:

This Article 5 sets forth the designation of the Classes of Claims and Interests and Article 6 below and Article 4 of the Plan further describe the treatment of such Claims and Interests. A Claim or Interest is classified in a particular Class for voting and Distribution purposes only to the extent that such Claim or Interest qualifies within the description of the Class and is classified in a different Class or Classes to the extent any portion of the Claim or Interest qualifies within the description of that different Class or Classes. Unless otherwise provided, to the extent a Claim or Interest qualifies for inclusion in a more specifically defined Class than a more generally defined Class, it is included in the more specifically defined Class.

Each of the following sections of this Article 5 provide explanations of the different Claim and/or Interest classifications. Priority Tax Claims, Administrative Claims and Deferred Administrative Claims have not been classified and are excluded from the Classes set forth in this Article 5 in accordance with § 1123(a)(1) of the Bankruptcy Code.

Contingent Payment Agreements are Executory Contracts associated with or incorporated into a Note. Class 1 consists of Notes. Each Contingent Payment Agreement is of no further force or effect upon the earlier occurrence of:

    (i)    the satisfaction pursuant to this Plan of the Note with which such Contingent Payment Agreement is associated or into which it is incorporated, or

    (ii)    the entry by the Bankruptcy Court of a Final Order confirming the rejection by Debtors of all Executory Contracts except for the two Omagine-CCC Options, both of which are being retained by Omagine.

Other than the Executory Contracts listed in Schedule G attached to the Plan as Exhibit N (which include the Contingent Payment Agreements), to the best knowledge of Debtors, there are no other Executory Contracts with respect to either Debtor in existence or known to Debtors as of the Filing Date.

Class 1, Class 2 and Class 3 below are Impaired Classes which classify all Unsecured pre-petition Claims against Omagine as of the Filing Date for all purposes of this Plan. The Holders and amounts of such Omagine Claims are detailed in Exhibit A, Exhibit B and Exhibit C attached to the Plan.

Class 4 below is an Impaired Class which classifies all Unsecured pre-petition Claims against JOL as of the Filing Date for all purposes of this Plan. The Holders and amounts of

such JOL Claims are detailed in Exhibit D attached to the Plan.

Class 5 below is an Unimpaired Class which classifies Equity Interests consisting of the Outstanding Common Shares for all purposes of this Plan. Such 28,650,190 Outstanding Common Shares are held by the Omagine Shareholders.

The treatment to be provided for Allowed Claims and Interests pursuant to this Plan and the consideration provided for herein shall be in full and final satisfaction, settlement, release and discharge of such Claims and Interests.

- Class 1 consists of the Omagine Note Claims (consisting of principal plus interest accrued up to the Filing Date) and Contingent Payment Agreements.

- Class 2 consists of the Omagine Pre-Petition Insider Claims.

- Class 3 consists of the Omagine Trade Vendor Claims.

- Class 4 consists of the JOL Trade Vendor Claims.

- Class 5 consists of the 28,650,190 Outstanding Common Shares.

Class 1, Class 2 and Class 3 Claims are sometimes referred to herein collectively as the Omagine Business Claims.

Subject only to a sufficient Recovery occurring, the Plan provides for:

1) the payment of the full or a Pro-Rata Amount of all Allowed Administrative Claims, and

2) the payment to Creditors of the full or a Pro-Rata Amount of the Class 1, Class 2 and Class 3 Allowed Omagine Business Claims, and

3) no payment to the JOL Creditors who are the Holders of the Class 4 JOL Trade Vendor Claims, and,

4) no change to the Outstanding Common Shares which constitute the Class 5 Equity Interests.

The Plan further provides for the merger of JOL with and into Omagine at the Merger Effective Time pursuant to the Merger Plan attached to the Plan as Exhibit Q. Article IV of the Merger Plan specifies that the JOL Shares shall not be converted in any manner, but all such JOL Shares shall be surrendered and extinguished at the Merger Effective Time. The shares of capital stock of Omagine shall not be affected by the Merger.

As of the date hereof, each of the BSA Engagement Agreement, the RBL Engagement Agreement, the Grossman Promissory Note and the Al-Sada Promissory Note have been executed by Omagine and the relevant counterparty and have been approved by the Bankruptcy Court. The Post-Petition Funders have funded their promissory notes and Omagine has paid BSA the $50,000 initial legal fee required by the BSA Engagement Agreement. BSA has initiated the Oman Contract Case and contingent upon a Recovery therefrom, the Plan will be funded.

Distributions under the Plan will be made through a hierarchy of six (6) sequentially numbered Distribution Pools which are utilized to establish the payment precedence for all Distributions.

New York State ("NYS") filed a proof of claim with the Bankruptcy Court in the estimated amount of $194.83 for estimated interest purported to be owed by Omagine (the "$194.83 Estimated Priority Tax Claim") and $5,000 of estimated penalties purported to be owed by Omagine (the "$5,000 General Unsecured Claim"). Omagine disputes these Claims alleged by NYS and Omagine has filed an objection to the foregoing alleged NYS Claims with the Bankruptcy Court in order to definitively resolve this matter. Notwithstanding the foregoing sentence, Omagine intends to pay NYS in accordance with the provisions of the Bankruptcy Code any amount determined to be an Allowed Claim owing to NYS.

Other than with respect to the possible $194.83 Estimated Priority Tax Claim, the sole source of funds for the payment Pools is a Recovery, if any, from the Oman Contract Case. Section 5.2 in the Plan and Article 4(E) above describes a possible NYS Allowed Claim. In the event of an Adverse Conclusion and no Recovery, the Plan will not be funded and no Claims will be paid other than the possible $194.83 Estimated Priority Tax Claim, if Allowed, which will be paid from Omagine's DIP bank Account or by Drohan.

Debtors believe that any alternative to confirmation of the Plan, such as conversion to a Chapter 7 case would likely result in increased unpaid administrative expenses and lower or no Distribution amounts being paid to Creditors.

5.1  **Sources of Cash for Distribution**.

Except for the possible payment of the $194.83 Estimated Priority Tax Claim, if Allowed, mentioned in Article 4 (E) above and in Section 5.2 of the Plan, the sole source of cash that may become available to fund Distributions and payments of Allowed Claims under the Plan is a Recovery. If a Governmental Unit Claim becomes an Allowed Claim, Omagine will pay such Allowed Governmental Unit Claim in accordance with the provisions of the Bankruptcy Code from the available cash in Omagine's Debtor-In-Possession bank account and/or, if necessary, from additional Post-Petition Financing to be arranged by Omagine subsequent to the date hereof. The occurrence of a Recovery depends entirely on the outcome of the Oman Contract Case and ***there can be no assurance given that a Recovery will occur***.

A.  **Pools**      If a Recovery does occur, the entire amount of such Recovery will constitute Pool 1 and the Pools will be utilized to prioritize and pay the Allowed Claims under the Plan as follows:

   i.  Pool 1 will consist of 100% of the funds constituting such Recovery and will be utilized to pay any Allowed Newfound Claim(s) determined to have priority over Claims the payment of which is allocated to any Pool subsequent to this Pool 1 (the "Pool 1 Payments").

ii. Pool 2 will consist of the funds remaining after making the Pool 1 Payments and will be utilized to pay the full amounts or Pro-Rata Amounts of the Allowed Grossman DIP Payment and the Allowed Al-Sada DIP Payment, both of which are Super-Priority Administrative Expense Claims (the "Pool 2 Payments").

iii. Pool 3 will consist of the funds remaining after making the Pool 2 Payments and will be utilized to pay the full amounts or Pro-Rata Amounts of the BSA Contingency Fee, the RBL Contingency Fee and the Allowed RBL Expenses Claim, all of which are Administrative Expense Claims (the "Pool 3 Payments").

iv. Pool 4 will consist of the funds remaining after making the Pool 3 Payments and will be utilized to pay the full amounts or Pro-Rata Amounts of the Allowed Omagine Business Claims as follows:

    1) the Allowed Class 1 Claims consisting of the Allowed Omagine Note Claims; and

    2) the Allowed Class 2 Claims consisting of the Allowed Omagine pre-petition Insider Claims; and

    3) the Allowed Class 3 Claims consisting of the Allowed Omagine Trade Vendor Claims,

(collectively, all of the foregoing (1), (2) and (3) being the pre-petition Unsecured Omagine Business Claims (the "Pool 4 Payments").

v. Pool 5 will consist of the funds remaining after making the Pool 4 Payments and will be utilized to pay the full amounts or Pro-Rata Amounts of the Allowed Insider Consultant Claims, all of which are post-petition Administrative Expense Claims (the "Pool 5 Payments").

vi. Pool 6 will consist of the funds remaining after making the Pool 5 Payments and will be utilized to pay the full amount or Pro-Rata Amount of the Allowed BSA Excess Expenses Claim if any (the "Pool 6 Payment").

vii. If a Newfound Claim should arise and become an Allowed Claim, then in such an event, such Allowed Newfound Claim will be paid in accordance with this Plan's provisions therefor or from the same Pool that the Allowed Claim most closely resembling such Newfound Claim is paid pursuant to the provisions of the Plan.

The funds, if any, remaining with Reorganized Omagine after making the Pool 6 Payment shall constitute the Remainder Funds which will be the property of and will be retained by Reorganized Omagine to be utilized by it at its sole discretion to pay for any and all Compliance Activities and ongoing operating expenses of Reorganized Omagine.

For the avoidance of doubt, all parties are advised that:

i. If any Pool is an Insufficient Funds Pool, then each Holder of an Allowed Claim,

who except for the existence of such Insufficient Funds Pool would be required to be paid in full, shall instead be paid a Pro-Rata Amount of such Holder's respective Claim from such Insufficient Funds Pool.

ii. If in any Pool, there are no, or de minimis funds, available to pay any of the Allowed Claims or Allowed Administrative Expense Claims in such Pool, then the Holders thereof shall not be paid any amount of such Allowed Claims or Allowed Administrative Expense Claims (a "Non-Payment").

iii. No full or partial payment of any amount from any Pool may be made unless and until the full payment amount of all payments due under the Plan to be made from the immediately preceding numbered Pool shall have been paid.

iv. Any funds remaining after making all payments required under the Plan (including all unclaimed Distribution funds and Remainder Funds if any) will be the property of and will be retained by Reorganized Omagine.

v. The Plan treats all of the 28,650,190 Outstanding Common Shares equally and does not disturb the Equity Interests constituting Class 5 in any way. The Outstanding Common Shares shall continue to remain as issued and outstanding Common Shares immediately after the Confirmation Date and the confirmation and implementation of the Plan will not cause any attributes or properties of the Outstanding Common Shares to be affected, changed or modified in any manner from that which was the case on the Filing Date. Since all such 28,650,190 Outstanding Common Shares and the Holders thereof are being treated equally by the Plan, Class 5 is an Unimpaired Class and the Holders of the Class 5 Equity Interests are therefore conclusively deemed to have accepted the Plan.

vi. Pursuant to the Plan, any full payment or Pro-Rata Amount payment or Non-Payment, as the case may be, of any Allowed Claim shall represent the full and final satisfaction thereof.

A. Pursuant to the Plan, the Unsecured pre-petition Allowed Omagine Business Claims will be paid before payment of the Deferred Administrative Claims. The Omagine Business Claims are classified into three separate Classes (Class 1, Class 2 and Class 3) but the Claims in all three such Classes shall be paid equitably out of Pool 4.

i. Class 1 is limited to Claims that are Unsecured Pre-Petition loans to Omagine memorialized by Notes which may contain Contingent Payment Agreements, including two such Note Claims held by Insiders.

ii. Class 2 is limited to Omagine Pre-Petition Insider Claims.

iii. Class 3 is limited to Unsecured Pre-Petition Omagine Trade Vendor Claims arising out of trade accounts payable for services or products supplied to

Omagine prior to the Filing Date.

If no Recovery is obtained at the Conclusion of the Oman Contract Case, then the Plan will not be funded and no payment of any kind shall be made in respect of any Claim other than an Allowed Priority Governmental Unit Claim, if any.

**5.2.   Description of the Plan.**

**A.     Retention of Property by Omagine**

   i.  On and after the Effective Date each of Reorganized Omagine and Reorganized JOL will retain all the property of their respective Estate free and clear of any and all liens, claims, and encumbrances.

   ii. Reorganized Omagine will have the rights and powers to assert any and all Causes of Action (defined as all causes of action, choses in action, claims, rights, suits, accounts or remedies belonging to or enforceable by Debtors, including Avoidance Actions, whether or not matured or unmatured, liquidated or unliquidated, contingent or noncontingent, known or unknown, or whether in law or in equity, and whether or not specifically identified in Debtors' schedules).

**B.     Parties Responsible for Implementation of the Plan**

   i.  Upon confirmation, Reorganized Omagine will be charged with administration of the Plan. Reorganized Omagine will be authorized and empowered to take such actions as are required to effectuate the Plan including the prosecution of Causes of Action. Reorganized Omagine will file all post-confirmation reports required by the United States Trustee's office. Reorganized Omagine will also file the necessary final reports and will apply for a Final Decree as soon as practical after substantial consummation, the completion of the claim's analysis and objection process and entry of the Final Order. Reorganized Omagine shall receive any Recovery and be responsible for the making of all Distributions therefrom and in the manner described herein and in the Plan to the various Holders of Claims. Reorganized Omagine will have the legal authority to enforce the terms of the Plan for the benefit of the Creditors. The Distributions from all Pools will be made by Reorganized Omagine. Reorganized Omagine is authorized to hold the funds for Pools 1 through 6 from which Distributions shall be made in accordance with the Plan. Any funds remaining after making the Pool 6 Payment, if any, will be retained by Reorganized Omagine and will be the property of Reorganized Omagine.

   ii. Reorganized Omagine may be authorized to reopen these Bankruptcy Cases after the entry of a Final Decree to enforce the terms of the Plan including for the purpose of seeking to hold a party in contempt or to enforce the

Confirmation or discharge injunction or otherwise afford relief to Debtors. The fee associated with Reorganized Omagine's motion to reopen either or both of the Bankruptcy Cases may be waived, and Reorganized Omagine may not be responsible for payment of such to the Clerk of the Court for the Bankruptcy Court or otherwise.

**C.    Liabilities of Reorganized Omagine**

Reorganized Omagine shall not have any liabilities except those expressly assumed under the Plan. Reorganized Omagine will be responsible for all operational expenses and those operational expenses will be paid in the ordinary course of business as they become due or as agreed by holders of the operational expense claims.

**D.    Funding of the Plan**

Other than with respect to an Allowed Priority Governmental Unit Claim, if any, the funding of the Plan is entirely contingent upon a Recovery being attained. The source of funds for the payments from Pools pursuant to the Plan is a Recovery, if any, resulting from the Oman Contract Case. If there is no Recovery obtained the Plan will not be funded.

**E.    Provisions Regarding Executory Contracts**

Other than the Executory Contracts defined in the Plan or as listed on Omagine's Schedule G attached to the Plan as Exhibit N and the Contingent Payment Agreements associated with the Class 1 Notes, there are no other Executory Contracts known to Debtors to be in existence as of the Filing Date with respect to either Debtor. To the extent any Person claims to be a party to an Executory Contract entered into prior to the Filing Date with either Debtor such Executory Contract (except for the Omagine-CCC Options) is rejected by the relevant Debtor and deemed rejected on the Effective Date. Should a Person assert the existence of any such an Executory Contract (except for the Omagine-CCC Options), such Person must file a claim within thirty (30) days of the Effective Date if such Person asserts a damage claim.

**F.    Avoidance Actions and Retained Rights**

The Plan provides that Reorganized Omagine shall retain all rights of action against RCA including pursuant to any adversary proceeding. Reorganized Omagine may also have claims against others which are also retained.

**G.    Treatment of Claims and Interests**

If a Recovery is obtained, then the funds constituting such Recovery will be utilized to pay the Allowed Claims pursuant to and in the prioritized order set out below. If a Recovery occurs, then the Plan provides:

    i.    for payment in the following order of the Allowed unpaid:

        A.    Allowed Newfound Priority Claims, if any;

        B.    Administrative Claims:

            a)  the Al-Sada DIP Payment and the Grossman DIP Payment;

            b)  the BSA Contingency Fee, RBL Contingency Fee and RBL Expenses;

        C.    Pre-Petition Omagine Business Claims;

        D.    Deferred Administrative Claims & other Allowed Claims;

            a)  Insider Consultant Claims;

            b)  the BSA Excess Expenses Claim (if any).

Notwithstanding the foregoing A, B, C and D, each Allowed Newfound Claim, if any, shall be paid in accordance with this Plan's priority provisions therefor or from the same Pool from which the Allowed Claim most closely resembling such Allowed Newfound Claim is paid.

    ii.    that no payment of any amount of the JOL Trade Vendor Claims shall be made irrespective of whether or not a Recovery is attained and that the JOL Shares are extinguished at the Merger Effective Time; and

    iii.    that all Contingent Payment Agreements in existence on the Filing Date shall, pursuant to their own terms, cease to exist on the Confirmation Date if not already previously rejected by Omagine prior to the Confirmation Date and such rejection is approved pursuant to a Final Order issued by the Bankruptcy Court.

## 6   Classes.

The classification and treatment of Claims and Interests will be as follows:

The following Class 1, Class 2 and Class 3 Claims constitute the Omagine Business Claims and they are identical in their respective pre-petition unsecured positions and precedence status regarding payment but are classified separately to distinguish the various characteristics in which they otherwise differ.

The treatment and voting rights of each Class is set forth in this Article 6 and in Article 4 of the Plan. Nothing herein shall constitute an admission as to the nature, validity or amount of any Claim. Debtors reserve the right to object to all Claims. Reorganized Omagine reserves the right to pay any Claim in full at any time and/or in accordance with the terms of the Plan (i.e., generally at the Distribution Date after a Recovery) without prepayment penalty.

There are thirty-six (36) Omagine Business Claims held by thirty four (34) Holders and the

aggregate amount of all such 36 Omagine Business Claims is $3,469,185. One Insider holds a Class 1 and a Class 2 Claim and one non-Insider holds a Class 1 and a Class 3 Claim. All Class 1, Class 2 and Class 3 Allowed Omagine Business Claims will be treated equally with respect to the payment thereof and will be paid from Pool 4 in accordance with the provisions of the Plan.

_____

*Class 1:*  *Omagine Note Claims including two such Claims held by Insiders*
*and Contingent Payment Agreements*

Class 1 Claims consist of thirteen (13) Claims against Omagine held by thirteen Holders thereof in the aggregate amount of $1,939,516. Eleven (11) of such Holders are non-Insiders holding an aggregate amount of $1,504,700 and two (2) of such Holders are Insiders holding an aggregate amount of $434,816. Each of such 13 Claims arose out of one or more loans to Omagine and each such loan is memorialized by a Note. Omagine has calculated the amount due under each Class 1 Note Claim based on (i) principal, plus (ii) accrued interest due as of the Filing Date. The accrued interest due as of the Filing Date was calculated as follows: (i) at the interest rate specified in the relevant Note when such Note did not specify a default interest rate, (ii) at the default interest rate specified in the relevant Note when such Note specified a default interest rate equal to or lower than the Maximum Allowed Interest Rate, and (iii) at the Maximum Allowed Interest Rate when such Note specified a Default Interest Rate in excess of the Maximum Allowed Interest Rate.

Some of the Notes also (i) call variously for a variety of penalties, incidental, consequential or liquidated damages and default interest rates in excess of the Maximum Allowed Interest Rate and other similar amounts (collectively, "Damages"), and (ii) include a Contingent Payment Agreement. Each Class 1 Note Claim includes all Damages, if any, associated with the relevant Note and satisfaction of each Class 1 Note Claim pursuant to this Plan includes (i) the satisfaction of all Damages, if any, associated with such relevant Note, and (ii) the termination of any Contingent Payment Agreement associated with or incorporated into such Note.

Each Contingent Payment Agreement in existence as of the Filing Date is an Executory Contract associated with or incorporated into a Class 1 Note. Each Contingent Payment Agreement exists for the sole purpose of providing an alternative method (not an additional method) to utilizing cash for the satisfaction of amounts due under its respective Class 1 Note. Pursuant to each Contingent Payment Agreement's own terms it no longer has any purpose and ceases to exist upon the full and final satisfaction of the amount due under its respective Class 1 Note. Pursuant to this Plan each Contingent Payment Agreement will cease to exist on the earlier of (i) the Confirmation Date when all such Contingent Payment Agreements will terminate upon satisfaction of all the Class 1 Notes pursuant to this Plan, or (ii) upon the entry by the Bankruptcy Court of a Final Order confirming the rejection by Debtors of all Executory Contracts other than the Omagine-CCC Options.

Five of the Class 1 Note Claims are recorded as unliquidated in Omagine's Schedule E/F filed with the Bankruptcy Court. Two of the Class 1 Note Claims which in the aggregate amount of $434,816 are held by Insiders, one directly and the other by a corporation owned by Insiders.

The Class 1 Note Claims (consisting of principal plus interest accrued up to the Filing Date) and the Holders thereof are set forth on Exhibit A attached to the Plan. The Holders of Class 1 Allowed Note Claims shall be paid in full from Pool 4 unless Pool 4 is an Insufficient Funds Pool, in which Case, each Holder of a Class 1 Allowed Note Claim will be paid the Pro-Rata Amount of its Claim from Pool 4.

If no Recovery is attained at the Conclusion of the Oman Contract Case, or if only de minimis funds are available in Pool 4, then Holders of Class 1 Allowed Note Claims will not be paid any amount of such Claims.

Payment of the full amount or Pro-Rata Amount of the Allowed Class 1 Note Claims is contingent upon the receipt of a Recovery from the Oman Contract Case and therefore all such Claims are impaired and the Holders thereof are entitled to vote to accept or reject the Plan but the vote and Claim amount of the two (2) Insiders in Class 1 will be disregarded when calculating and counting the valid votes to accept or reject the Plan.

 Nothing herein shall constitute an admission as to the nature, validity, or amount of the Class 1 Claims. Omagine reserves the right to object to any and all Claims.

_____

### Class 2:        *Omagine Pre-Petition Insider Claims*

Class 2 Claims consist of four (4) Claims against Omagine held by four Insiders in the aggregate amount of $1,157,873, which represent accrued and unpaid pre-petition amounts due to Insiders as of the Filing Date for consulting compensation, vendor payments paid on behalf of Omagine for products and/or services supplied to Omagine, and cash advances to Omagine from such Insiders as of the Filing Date. Neither Debtor has had any employees for several years prior to the Filing Date and Omagine has used and continues to use, the consulting services of certain Insiders from time to time as required.

The Class 2 Claims and the Holders thereof are set forth on Exhibit B attached to the Plan. The Holders of Class 2 Allowed Claims shall be paid in full from Pool 4 unless Pool 4 is an Insufficient Funds Pool, in which case, each Holder of a Class 2 Allowed Claim will be paid the Pro-Rata Amount of its Claim from Pool 4.

If no Recovery is attained at the Conclusion of the Oman Contract Case, or if only de minimis funds are available in Pool 4 then Holders of Class 2 Allowed Claims will not be paid any amount of their Class 2 Allowed Claims.

Payment of the full amount or Pro-Rata Amount of the Class 2 Claims is contingent upon the receipt of a Recovery from the Oman Contract Case and therefore all Allowed Class 2

Claims are Impaired and the Holders thereof are entitled to vote to accept or reject the Plan but since all four of such Class 2 Holders are Insiders, their votes and the aggregate amount of their Claims will be disregarded in determining whether or not to accept or reject the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of the Class 2 Claims. Omagine reserves the right to object to any and all Claims.

_____

### Class 3:    *Omagine Trade Vendor Claims*

Class 3 Claims consist of nineteen (19) Claims against Omagine held by 19 Holders in the aggregate amount of $371,796 for products and/or services supplied to Omagine prior to the Filing Date and which remained as unpaid trade accounts payable of Omagine on the Filing Date.

The Class 3 Claims and Holders thereof are set forth on Exhibit C attached to the Plan. The Holders of Class 3 Allowed Claims shall be paid in full from Pool 4 unless Pool 4 is an Insufficient Funds Pool, in which Case, each Holder of a Class 3 Allowed Claim will be paid the Pro-Rata Amount of its Claim from Pool 4.

If no Recovery is attained at the Conclusion of the Oman Contract Case, or if only de minimis funds are available in Pool 4, then Holders of Class 3 Allowed Claims will not be paid any amount of their Class 3 Allowed Claims.

Payment of the full amount or Pro-Rata Amount of the Class 3 Claims is contingent upon the receipt of a Recovery from the Oman Contract Case and therefore all Allowed Class 3 Claims are impaired and the Holders thereof are entitled to vote to accept or reject the Plan.

Nothing herein shall constitute an admission as to the nature, validity, or amount of the Class 3 Claims. Omagine reserves the right to object to any and all Claims.

_____

### Class 4:    *JOL Trade Vendor Claims*

Class 4 Claims consist of three (3) Claims against JOL in the aggregate amount of $90,250 for services alleged to have been supplied to JOL over 15 years prior to the Filing Date and which remained on JOL's records as trade accounts payable on the Filing Date. The Class 4 Claims and Holders thereof are set forth on Exhibit D attached hereto.

JOL is a wholly owned subsidiary of Omagine and pursuant to the Plan it will be merged with and into Omagine after the Effective Date at which time its separate corporate existence will cease and all of the JOL Shares will be extinguished.. JOL's only recent business purpose was to subscribe for and purchase 10,000 of the Omagine-Oman Shares at the incorporation of Omagine-Oman in 2009 in Oman because Omani law at the time required Omagine-Oman to have at least two shareholders. In 2011 three additional Persons became shareholders of Omagine-Oman. In 2013 Omagine acquired the 10,000 Omagine-Oman

Shares previously owned by JOL leaving JOL with no Assets or operations. All three JOL Claims are at least fifteen years old as of the Filing Date, have not been pursued by the Holders thereof during the past 15+ years, and are therefore likely barred as a matter of law because of the 15+ years they have remained outstanding without comment or concern from the Holders thereof. Furthermore, the three Class 4 JOL Trade Vendor Claims are all unliquidated claims and as of the date hereof no proof of claim has been filed with respect to any of them.

All Class 4 Claims are impaired and the Holders thereof are therefore entitled to vote to accept or reject the Plan. Under Section 1126(g) of the Bankruptcy Code a Class such as Class 4 is deemed not to have accepted the Plan if such Plan provides that the Claims of such Class do not entitle the Holders of such Claims to receive or retain any property under the Plan on account of such Claims.

Since no payment of any amount will be paid to the Holders of Class 4 JOL Trade Vendor Claims, Class 4 is an Impaired Class and such Class 4 Holders are deemed to have rejected the Plan. JOL reserves the right to object to any and all Claims.

---

**Class 5:**    *Equity Interests consisting of the 28,650,190 Outstanding Common Shares*

Class 5 consists exclusively of the 28,650,190 Common Shares issued and outstanding as of the Filing Date and the date hereof.

The Plan treats all 28,650,190 Outstanding Common Shares equally and does not disturb such Equity Interests constituting Class 5 in any way. The Outstanding Common Shares shall continue to remain as issued and outstanding Omagine Common Shares immediately after the Confirmation Date and the confirmation and implementation of this Plan will not cause any attributes or properties of the Outstanding Common Shares to be affected, changed or modified in any manner from that which was the case on the Filing Date. No legal, equitable, or contractual right attaching to any of the Class 5 Equity Interests is modified or altered by this Plan. Since all such 28,650,190 Outstanding Common Shares and the Holders thereof are being treated equally by this Plan, Class 5 is an Unimpaired Class.

Under Section 1126(f) of the Bankruptcy Code since Class 5 which is not Impaired under the Plan, each Holder of a Class 5 Equity Interest is conclusively presumed to have accepted the Plan. Solicitation of acceptances of the Plan from the Omagine Shareholders who are the Holders of such Class 5 Equity Interests is therefore not required.

---

**7**    **The Securities Act, the Exchange Act and the SEC Registration**

The Common Stock is registered with the SEC pursuant to the requirements of the Exchange Act and the Securities Act and Omagine is subject to the reporting requirements of the

Exchange Act. Omagine expects that during the pendency of these Bankruptcy Cases it will not have the significant amount of funds continuously required to remain in compliance with the provisions of either the Securities Act or the Exchange Act relative to publicly traded companies.

Notwithstanding the foregoing, Omagine believes that if a Recovery occurs that results in at least sufficient Remainder Funds to provide Omagine with the financial and staff capacity to undertake, perform and finance the Compliance Activities, it can accomplish the Compliance Activities within three months after the Recovery Date. In the absence of the availability of such Remainder Funds however, Omagine may have to raise fresh equity capital and/or find a suitable merger partner, both of which activities are expected to be greatly facilitated by a successful reorganization of Omagine via this Chapter 11 bankruptcy proceeding.

## 8    Administrative Expenses.

Treatment of Administrative Expense Claims is set out below and in Article 5 of the Plan.

### 8.1    Summary.

Pursuant to Section 1123(a)(l) of the Bankruptcy Code, Administrative Expense Claims against Debtors are not classified for purposes of voting on or receiving Distributions under the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance with this Article 8 and Article 5 of the Plan and in accordance with the requirements set forth in Section 1129(a)(9)(A) of the Bankruptcy Code.

Allowed Administrative Expense Claims shall be paid in full or in a Pro-Rata Amount (i) on or promptly after the Distribution Date, or (ii) after the Distribution Date on the Final Order Date relative to the entry of a Final Order allowing a Claim if such Final Order Date occurs after the Distribution Date, or (iii) as may be otherwise provided pursuant to the Plan, or (iv) as otherwise agreed between Omagine and the Holder of a Claim, or (v) on such other date after the Distribution Date as the Bankruptcy Court may direct. Omagine will pay either the full amount or Pro-Rata Amount of any Allowed Newfound Claim, if any, in accordance with this Plan's priority provisions therefor or from the same Pool from which the Allowed Claim most closely resembling such Allowed Newfound Claim is paid.

Omagine intends to pay the Allowed Administrative Expense Claims from the proceeds of a Recovery and as agreed by the Holders of such Administrative Expense Claims. Post Confirmation, Debtors shall pay the normal operating administrative expenses, including professionals without necessity of a Bankruptcy Court order.

### 8.2    Governmental Unit Claims

New York State and the State of Delaware are Governmental Units and as such are entitled to priority under 11 U.S.C. § 507(a)(8) for their Claims which are not otherwise specifically classified in the Plan. The amount of any claim of a Governmental Unit that is not assessed

or assessable on or prior to the Effective Date, and the right of the particular Governmental Unit to payment, if any, in respect thereto shall (i) be determined in the manner in which the amount of such Claim and the rights of the particular Governmental Unit would have been resolved or adjudicated if the Bankruptcy Case had not been commenced, (ii) survive after the Effective Date as if the Bankruptcy Case had not been commenced, and (iii) not be discharged pursuant to Section 1141 of the Bankruptcy Code if applicable. Omagine reserves the right to pay any Governmental Unit Claim in full at any time.

A failure by Reorganized Omagine to make a payment to a Holder of an Allowed Governmental Unit Claim pursuant to the terms of the Plan shall be an event of default as to the applicable Holder of such Claim. In the event of such a default, the applicable Holder must send written notice (a "Default Notice") to Reorganized Omagine. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default, as well as notice that Reorganized Omagine has until the Business Day next following fifteen (15) days after receipt by Omagine and Omagine's counsel of the Default Notice to cure such default (and the address for payment, which will accept overnight deliveries, in the event of a monetary default). In the event of an uncured default following proper Default Notice procedures, the Governmental Unit Claim Holder may (a) enforce the entire amount of its Allowed Governmental Unit Claim; (b) exercise any and all rights and remedies it may have under applicable non-bankruptcy law; and (c) seek such relief as may be appropriate in the Bankruptcy Court.

Omagine has maintained only a virtual operation via the internet since December 2018 and Debtors have not maintained any physical office presence at any location since that time. Omagine presently maintains mailing addresses in New York and in Florida. No federal or state income taxes are due or payable from either Debtor. As of the date hereof Omagine has timely filed all of its U.S. federal income tax returns.

Omagine's pre-petition liabilities contain an accrued amount payable to the State of Delaware for pre-petition estimated Delaware franchise tax due (the "Delaware Franchise Tax") but this estimated amount is uncertain and the State of Delaware has made no claim with respect thereto. Omagine has contacted the Delaware state tax department and was advised by its personnel that Omagine should file any franchise tax returns and pay any amounts that may be determined to be due after the Three Cases are resolved. The Delaware Franchise Tax Claim is an estimate by Omagine for pre-petition Delaware franchise tax which Omagine intends to calculate precisely and pay pursuant to the provisions of the Plan.

On April 27, 2020 (the month following the Filing Date), New York State ("NYS") filed a claim with the Bankruptcy Court in the amount of $4,194.83 for interest and penalties purported to be owed by Omagine (the "First Estimated NYS Claim"). The First Estimated NYS Claim is for purported pre-petition interest and penalties estimated by NYS and it

refers to purported activities in NYS by Omagine during the four (4) quarterly periods ended 9/30/2019; 6/30/2019; 3/31/2019; and 12/31/2018; (the "First Assessment Period"). Omagine had neither employees nor an active presence in NYS during the First Assessment Period.

One day later on April 28, 2020, NYS amended the First Estimated NYS Claim by (i) extending the First Assessment Period to include the quarterly period ended 12/31/2019 and referring to purported activities in NYS by Omagine during the five (5) quarterly periods ended 12/31/2019; 9/30/2019; 6/30/2019; 3/31/2019; and 12/31/2018 (the Second Assessment Period"), and (ii) adding an additional $1,000 estimated penalty for a new total estimated amount of $5,194.83 (the "Second Estimated NYS Claim"). NYS filed the Second Estimated NYS Claim with the Bankruptcy Court. The Second Estimated NYS Claim consists of $194.83 of interest estimated by NYS (the "$194.83 Estimated Priority Tax Claim") and $5,000 of penalties estimated by NYS (the "$5,000 General Unsecured Claim") through and including the Second Assessment Period ended 12/31/2019. Omagine had neither employees nor an active presence in NYS during the Second Assessment Period.

On May 6, 2020, NYS filed another claim in the amount of zero ($0.00) with the Bankruptcy Court (the "Third Estimated NYS Claim"). The Third Estimated NYS Claim was accompanied by a letter to the Bankruptcy Court (the "NYS Letter") which stated that NYS would file a claim and assessment as soon as the necessary information could be obtained to determine an amount owed. As of the date hereof NYS has not filed any such claim or assessment. Moreover, it is evident that both the $5,194.83 Second Estimated NYS Claim and the $0.00 Third Estimated NYS Claim are in respect of the same issue during the same time periods. Omagine had neither employees nor an active presence in NYS during such time periods.

Two months later Omagine received a letter dated July 16, 2020 (the "Second NYS Letter") from the same NYS person who filed the Third Estimated NYS Claim. The Second NYS Letter had an enclosed form (the "NYS Form") and inquired about Omagine's quarterly unemployment insurance returns for the seven (7) quarterly periods ended 3/31/2020; 12/31/2019; 9/30/2019; 6/30/2019; 3/31/2019; 12/31/2018; and 9/30/2018 (the "Third Assessment Period") and instructed Omagine to either file the returns or complete and return the NYS Form indicating why the returns were no longer required. Omagine promptly responded to the Second NYS Letter on July 20, 2020 by completing and sending the NYS Form to NYS by fax and overnight courier service (for both of which, Omagine has a proof of delivery). As requested in the NYS Form, Omagine confirmed that it had permanently ceased paying wages on February 15, 2016 and had ceased operations on December 31, 2018.

To the best of Omagine's information and belief, since sending NYS the completed NYS Form on July 20, 2020:

    i.    Neither Omagine nor the Bankruptcy Court has heard anything further from NYS; and

    ii.    NYS has not filed any further amendment(s) to the Second Estimated NYS Claim; and

    iii.    NYS has not filed any further claim or assessment with respect to its zero ($0.00) Third Estimated NYS Claim since receiving the requested information from Omagine.

Considering the foregoing (SEE: Exhibit M to the Plan ) Omagine assumes that NYS agrees with Omagine that no amount is due or owing in respect of either the Second Estimated NYS Claim or the Third Estimated NYS Claim but Omagine has not yet confirmed this assumption with NYS.

Omagine has filed an objection to the foregoing alleged NYS Claims with the Bankruptcy Court in order to definitively resolve this matter. Should Omagine's objection not be sustained, Omagine intends to pay in accordance with the provisions of the Bankruptcy Code any amount determined to be an Allowed Claim owing to NY State (a "NYS Allowed Claim").

**8.3**     **Deferred Administrative Expense Claims**.

The Deferred Administrative Claims consist of the BSA Excess Expenses Claim and the Insider Consultant Claims. Like all Administrative Expense Claims, the Deferred Administrative Claims would generally be paid before paying the pre-petition unsecured Omagine Business Claims.

Pursuant to the Plan however:

    i.    the Insider Consultants have agreed that the Insider Consultant Claims will be paid out of Pool 5 after the full payment of the pre-petition Omagine Business Claims (Class 1, Class 2 and Class 3) have been made, and

    ii.    BSA has agreed that the BSA Excess Expenses Claim, if any, will be paid out of Pool 6 and only after the full payment of all other obligations under the Plan have been made.

The full or Pro-Rata Amount payments under the Plan will occur after a Recovery as follows:

    i.    Any Allowed Newfound Claim(s) determined to have priority over Claims the payment of which is allocated to any Pool subsequent to Pool 1 will be paid from Pool 1, and

    ii.    The Al-Sada DIP Payment and the Grossman DIP Payment will be paid from Pool 2, and

    iii.    The BSA Contingency Fee, the RBL Contingency Fee and the RBL Expenses will be paid from Pool 3, and

iv.    The Omagine Business Claims (Class 1, Class 2 & Class 3) will be paid from Pool 4, and

v.    The Insider Consulting Claims (which are Deferred Administrative Claims) will be paid from Pool 5, and

vi.    The BSA Excess Expenses Claim (which is a Deferred Administrative Claim) will be paid from Pool 6, and

vii.    Any Allowed Newfound Claim not otherwise classified or included elsewhere in the Plan, if any, will be paid in accordance with this Plan's provisions therefor or from the same Pool from which the Allowed Claim most closely resembling such Allowed Newfound Claim is paid. .

8.4    **Administrative Expense Claims**.

Subject to the provisions of Sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Expense Claim will be paid the full or Pro-Rata Amount of such Claim in cash as specified in the Plan on the latest of;

i.    the Distribution Date, or

ii.    as soon as practical after the date on which such Claim becomes an Allowed Administrative Expense Claim,

or upon such other terms as may be agreed upon by such Holder and Debtor or Reorganized Debtor or as otherwise ordered by the Bankruptcy Court; provided, however, that Allowed Administrative Expense Claims representing obligations incurred by Reorganized Omagine in the ordinary course of business post confirmation, or otherwise assumed by Reorganized Omagine on the Effective Date pursuant to the Plan, including any tax obligations arising after the Filing Date, will be paid or performed by Reorganized Omagine when due in accordance with the terms and conditions of the relevant particular agreements or non-bankruptcy law governing such obligations. On the Effective Date, Reorganized Omagine will assume all unsatisfied Administrative Expense Claims or portions thereof not already then satisfied pursuant to the Plan and will pay each such Administrative Expense Claim or portion thereof when and if due in accordance with the terms of the Plan.

Except as otherwise provided in the Plan, any Person holding an Administrative Expense Claim, other than any such Claim arising from the operation by Debtors of their business in the ordinary course of business, shall file a proof of such Administrative Expense Claim with the Bankruptcy Court within thirty (30) days after Reorganized Omagine provides notice by mail or by publication in a form and manner approved by the Bankruptcy Court of the occurrence of the Confirmation Date. At the same time any Person files a proof of any such Administrative Expense Claim, such Person shall also serve a copy thereof upon counsel for Reorganized Omagine. Any Person who fails to timely file and serve a proof of such Administrative Expense Claim shall be forever barred from seeking payment of such

Administrative Expense Claim by Debtors, the Estate, or Reorganized Omagine.

Any Person seeking an award by the Bankruptcy Court of Professional Compensation shall file a final application with the Bankruptcy Court for allowance of Professional Compensation for services rendered and reimbursement of expenses incurred through the Recovery Date within sixty (60) days after the Recovery Date or by such other deadline as may be fixed by the Bankruptcy Court.

Notwithstanding the foregoing, the Bankruptcy Court has approved the execution and delivery by Omagine and the relevant counterparty of the BSA Engagement Agreement, the RBL Engagement Agreement, the Al-Sada Promissory Note and the Grossman Promissory Note and has thereby approved the payments memorialized therein of the RBL Contingency Fee, the BSA Contingency Fee, the Al-Sada DIP Payment and the Grossman DIP Payment so, except in respect of the BSA Excess Expenses and the RBL Expenses, the Holders of such Administrative Expense Claims need not file the proof of claims called for in this Article 8.4.

The Bankruptcy Court has approved Omagine giving a "super priority" over other unsecured creditors to the Al-Sada DIP Payment and the Grossman DIP Payment pursuant to 11 U.S.C. § 364.

**9.      Tax Consequences.**

Tax consequences resulting from confirmation of the Plan can vary greatly among the various Classes of Creditors and Holders of Interests, or within each Class. Significant tax consequences may occur under the Internal Revenue Code and pursuant to state, local, and non-U.S. tax statutes as a result of confirmation of the Plan. Because of the various tax issues involved, the differences in the nature of the Claims of various Creditors and Holders of Equity Interests, the taxpayer status and methods of accounting and prior actions taken by Creditors with respect to their Claims and Holders of Equity Interests with respect to their Equity Interests, as well as the possibility that events subsequent to the date hereof could change the tax consequences, this discussion is intended to be general in nature only. No specific tax consequences to any Creditor or Holder of an Interest are represented, implied, or warranted. Each Holder of a Claim or Interest should seek professional tax advice, including the evaluation of recently enacted or pending legislation, because recent changes in taxation may be complex and lack authoritative interpretation.

THE PROPONENT ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN ON THEIR INDIVIDUAL SITUATIONS.

The receipt by a Creditor or Interest Holder of cash or property in full or partial payment of its Claim or Interest may be a taxable event. To the extent that a portion of the cash or the

fair market value of any property received is attributable to accrued and unpaid interest on a Claim being paid, a Creditor may recognize interest income. A Creditor or Interest Holder may also recognize gain or loss equal to the difference between the sum of the amount of cash received and the adjusted basis in the Claim or Interest for which the Holder receives amounts under the Plan. Such gain or loss may be treated as ordinary or capital depending upon whether the Claim or Interest is a capital asset.

Under the backup withholding rules of the Tax Code, a Holder of a Claim may be subject to backup withholding with respect to Distributions made pursuant to the Plan unless such Holder (i) is a corporation or comes within certain other exempt categories and when required demonstrates this fact, (ii) is a non U.S. Person not subject to backup withholding and when required executes the proper IRS form W-8BEN to demonstrate this fact or (iii) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that such Holder is not subject to backup withholding due to a failure to report all dividends and interest.

## 10.    **Liquidation Analysis.**

Debtors set forth the following liquidation test: Holders of Claims or Interests would not receive any greater return in a Chapter 7 liquidation of Debtors' de minimis assets. In a March 30, 2018 public filing with the SEC attached to the Plan as Exhibit L, and in all of its monthly reports filed with the U.S. Trustee and the Bankruptcy Court through March 31, 2022, the Proponent has reported the de minimis nature of its assets. It is Proponent's belief that, in the event of a conversion to Chapter 7 or dismissal of this case or if a Chapter 11 Trustee is appointed, (i) the possibility of a lesser or no return being realized by any of the Creditors is greatly increased, and (ii) a Chapter 7 trustee, if appointed, would likely incur substantial additional costs with the increased likelihood that such costs would not be timely – or ever - reimbursed.

Funding of the Plan is completely contingent upon attaining a Recovery at the Conclusion of the Oman Contract Case. Other than the approximately $2,748 presently in Omagine's DIP bank account and the voluntary funding of its limited ongoing operations by Omagine's president, Debtors presently have no source of funds other than the possibility of such a Recovery at the Conclusion of the Oman Contract Case. In the event of an Adverse Conclusion, Debtors expect that no Claims other than Governmental Unit Priority Claims, if any, will be paid.

The sole source of funds available for Distribution to Creditors is an uncertain but possible Recovery pursuant to the Oman Contract Case. While Omagine believes it has a reasonable case with respect to the Oman Litigation Claim, the ultimate outcome of the Oman Contract Case and the occurrence and amount, if any, of a Recovery is impossible to predict. The amount of funds, if any, Omagine or Reorganized Omagine will have available for Distribution under the Plan from a Recovery is also subject to both economic and political uncertainties. All parties should be aware that the political and economic risks in Oman

attendant to attaining a Conclusion and Recovery are not insignificant.

In the event of a Recovery, the proceeds of any such Recovery will be utilized in sequential Pools, the sequence, amounts and utilization of which is detailed in Article 5.1 hereof and in Article 3.2 of the Plan.

In Debtors' opinion, the dismissal of the Bankruptcy Cases or their conversion to a Chapter 7 liquidation involves a substantial degree of risk to the Debtors' chances for a Recovery and positive outcome to the Oman Contract Case, which risk materially increases the likelihood that no payments of any Allowed Claims would ever occur.

The Debtors' estimated liquidation analysis and analysis of Plan payments if the Bankruptcy Cases were converted to a Chapter 7 and a trustee appointed is that, in such an event, no Distributions or payments of any kind would be made to any Holder of an Allowed Claim. The values on liquidation stated herein are Debtors' best estimates but are estimates, nonetheless. Debtors estimate that no Distribution would occur or be made in a Chapter 7 case.

**11.    Procedures for Treating and Resolving Disputed Claims or Interests.**

**A.    Objection to Claims or Interests**

The Plan provides that Debtors, Reorganized Omagine and any Holder of a Claim or Interest shall be entitled to object to Claims or Interests or to the treatment thereof by the Plan provided however, that Debtors, Reorganized Omagine and any such Holder shall not be entitled to object to any Claim or Interest or to the treatment thereof by the Plan (i) that has been Allowed by a Final Order entered by the Bankruptcy Court prior to the Effective Date or (ii) that is Allowed by the express terms of the Plan. Any objection to a Claim or Interest must be filed by the Objection Deadline.

**B.    No Distributions Pending Allowance**

Except as otherwise provided in the Plan, no Distributions will be made with respect to any portion of a Claim unless and until (i) the Objection Deadline has passed and no objection to such Claim or Interest or to the treatment thereof by the Plan, as the case may be, has been filed, or (ii) any objection to such Claim or Interest or to the treatment thereof by this Plan, as the case may be, has been settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court.

**C.    Estimation of Claims**

Debtors may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to the Bankruptcy Code regardless of whether Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent

or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All the aforementioned Claims objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.

**D.      Resolution of Objections to Claims or Interests**

On and after the Effective Date, Reorganized Omagine shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Claims or Interests without approval of the Bankruptcy Court.

**12.      Conditions Precedent to the Confirmation Date and to the Effective Date**

**A.      Conditions to Confirmation Date**

The following are conditions precedent to confirmation of the Plan and the occurrence of the Confirmation Date that may be satisfied or waived in accordance with Article 11.3 of the Plan: (a) the Bankruptcy Court shall have approved the Disclosure Statement with respect to the Plan; and (b) the Confirmation Order shall have been signed by the Bankruptcy Court and entered on the docket of the Bankruptcy Court.

**B.      Conditions to Effective Date**

The following are conditions precedent to the occurrence of the Effective Date, each of which may be satisfied or waived in accordance with Article 11.3 of the Plan.

   i.    The Confirmation Order shall not have been vacated, reversed or modified, and as of the Effective Date, shall not be stayed.

   ii.    All documents and agreements to be executed on the Effective Date or otherwise necessary to implement the Plan shall be in form and substance that is acceptable to Omagine in its reasonable discretion.

   iii.    Each Debtor shall have received any authorization, consent, regulatory approval, ruling, letter, opinion or document that may be necessary to implement the Plan and that is required by law, regulation or order.

Under the Plan, each of the conditions set forth above may be waived in whole or in part by either Debtor without any notice to the Bankruptcy Court or to any other party in interest and without a hearing. The failure to satisfy or waive any condition to the occurrence of either the Confirmation Date or the Effective Date may be asserted by either Debtor in its sole discretion regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by either Debtor in its sole discretion). The failure of either Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights and each such right shall be deemed an ongoing right which may be asserted at any time.

13.    **Certain Effects of Confirmation**

A.    <u>**Revesting of Debtors' Assets.**</u>

On the Effective Date, except as otherwise explicitly provided in the Plan, all property comprising the Estates (including Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in Reorganized Omagine or in Reorganized JOL as the case may be, free and clear of all Claims, liens, charges, claims, encumbrances, rights and interests of Creditors and Interest Holders except as may be otherwise specified in the Plan. As of the Effective Date, Reorganized Omagine and Reorganized JOL may operate their respective businesses and use, acquire and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than those restrictions expressly imposed by the Plan or the Confirmation Order.

B.    <u>**Discharge of Claims and Termination of Interests**</u>.

Except as otherwise provided in the Plan, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever against the Debtors or any of their Assets, property or estates, including any interest accrued on such Claims from and after the Filing Date; (b) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holder failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged and released in full and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under Section 502(g) of the Bankruptcy Code; and (d) all Persons shall be precluded from asserting against Reorganized Omagine, the Debtors, the Debtors' Estates, Reorganized Debtors, their successors and assigns and their assets and properties any other Claims and Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

C.    <u>**Term of Injunctions or Stays**</u>.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under Section 105 or 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date shall remain in full force and effect until the later of the Effective Date or the date indicated in the order providing for such injunction or stay.

D.    <u>**Injunction Against Interference with Plan.**</u>

From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner, whether directly, derivatively or otherwise, any suit, action or other proceeding, on account of or respecting any Claim, Interest, claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or

liability whatsoever discharged or to be discharged pursuant to the Plan or the Confirmation Order against the Debtors, the Reorganized Debtors and their Assets. For the avoidance of doubt, in connection with such injunction, all Persons are permanently enjoined from (i) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order of any kind whatsoever, (ii) creating, perfecting or enforcing any encumbrance of any kind, (iii) asserting any right of setoff, subrogation or recoupment of any kind, or (iv) commencing or continuing in any manner any action or proceeding of any kind on account of or in connection with or with respect to any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, Claim, Interest, remedy, or liability whatsoever discharged or to be discharged pursuant to the Plan or the Confirmation Order.

**E.**    **Releases by the Debtors**.

**As of the Effective Date, except for the right to enforce the Plan, for good and valuable consideration including without limitation the Exculpated Persons' contributions to facilitating the Reorganization and implementation of the Plan and the fact that the Debtors continue to receive the labor and guidance of the Exculpated Persons including work in Oman by them on the Oman Contract Case, to the fullest extent permitted by applicable law, the Exculpated Persons are deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, their Estates and the Reorganized Debtors from (and the Debtors, their Estates, and the Reorganized Debtors are deemed to covenant with, and to, the Exculpated Persons not to sue or otherwise seek recovery from the Exculpated Persons on account of) any and all claims, interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest, or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the restructuring of Omagine into Reorganized Omagine, the Reorganized Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Exculpated Person, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, or related agreements, instruments or other documents, or the solicitation of votes with respect to the Plan taking place from the beginning of time through the Effective Date; provided that no Exculpated Person shall be released under this Section 13E from any act or omission that constitutes fraud,**

**gross negligence or willful misconduct as determined by a Final Order and nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).**

F.    <u>Exculpation.</u>

**No Exculpated Person shall have or incur, and each Exculpated Person is hereby released and exculpated from, any claim, obligation, cause of action or liability for any claim for any act or omission in connection with, relating to or arising out of the administration of the Chapter 11 Cases, the formulation, negotiation and drafting of the Plan, the Disclosure Statement or any contract, instrument, other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with the Plan, the solicitation of votes for the Plan, or confirmation or consummation of the Plan, the funding of the Plan, or the implementation or administration of the Plan or the property to be distributed under the Plan or any transactions, decisions, actions and/or inactions contemplated by or relating to any of the foregoing, except for willful misconduct or gross negligence as determined by a Final Order, but in all respects such Exculpated Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtors (and each of their respective agents, directors, officers, employees, affiliates, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances or rejections of the Plan and, therefore, are not, and on account of any such solicitation shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such Distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Persons from liability. Without limiting the generality of the foregoing, the Exculpated Persons shall be entitled to and granted the protections and benefits of Section 1125(e) of the Bankruptcy Code. Pursuant to Section 105 of the Bankruptcy Code, no Holder or purported Holder of an Administrative Claim, claim or Interest shall be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any claim against an Exculpated Person that accrued on or before the Effective Date and that has been exculpated pursuant to the Plan.**

G.    <u>Solicitation of the Plan</u>.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, Sections 1125 (a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers and attorneys shall be deemed to have

participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with respect to the solicitation of acceptances or rejections of the Plan and therefore are not, and on account of such solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan.

### H.    Corporate Action.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the selection of the managers, directors and officers for Reorganized Omagine and (b) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms of the Plan. On or (as applicable) before or after the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or Reorganized Debtors, as the case may be, including any and all other agreements, documents, and instruments deemed by such officers to be necessary, desirable or convenient. The authorizations and approvals contemplated by this Article 13H shall be effective notwithstanding any requirements under non-bankruptcy law.

### I.    Setoffs.

Debtors or Reorganized Omagine may but shall not be required to set off against any Claim, the payments or other Distributions to be made pursuant to the Plan to a Holder in respect of such Claim or claims of any nature whatsoever that Debtors may have against such Holder; but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by Debtors or Reorganized Omagine of any such claim that Debtors or Reorganized Omagine may have such Holder.

### J.    Miscellaneous Plan Provisions

#### i.    Modification of Plan

Debtors may modify the Plan pursuant to Section 1127 of the Bankruptcy Code and as provided in the Plan to the extent applicable law permits. Debtors may modify the Plan in accordance with this paragraph before or after confirmation and without notice or hearing if the Bankruptcy Court finds that such modification does not materially and adversely affect the rights of any parties in interest which have not had notice and an opportunity to be heard with regard thereto or after such notice and hearing as the Bankruptcy Court deems appropriate. In the event of any modification on or before the Confirmation Date, any votes to accept or reject the Plan shall be deemed to be votes to accept or reject the Plan as modified, unless the Bankruptcy Court finds that the modification materially and adversely affects the rights of parties in interest which have cast said votes. Debtors reserve

the right in accordance with Section 1127 of the Bankruptcy Code to modify the Plan at any time before the Confirmation Date.

ii. **Construction**.

In this Disclosure Statement (i) words denoting the singular include the plural and vice versa, (ii) "it" or "its" or words denoting any gender include all genders, (iii) the word "including" shall mean "including without limitation," whether or not expressed, (iv) when calculating a period of time within or following which any act is to be done or steps taken, the date which is the reference day in calculating such period shall be excluded and if the last day of such period is not a Business Day, then the period shall end on the next day which is a Business Day, and (v) except as otherwise provided herein, all dollar amounts are expressed in USD.

iii. **Retention of Jurisdiction**

The Plan provides that after the Effective Date, the Bankruptcy Court shall have or retain jurisdiction for the following purposes:

a. To adjudicate objections concerning the allowance, priority or classification of Claims or Interests and any subordination thereof, and to establish a date or dates by which objections to Claims or Interests must be filed to the extent not established in the Plan;

b. To liquidate the amount of any disputed, contingent or unliquidated Claim, to estimate the amount of any disputed, contingent or unliquidated Claim, to establish the amount of any reserve required to be withheld from any Distribution under the Plan on account of any disputed, contingent or unliquidated Claim, or portion thereof;

c. To resolve all matters related to the treatment of any Executory Contract and/or Interest;

d. To hear and rule upon all Retained Actions, Avoidance Actions and other Causes of Action commenced and/or pursued by either Debtor and/or Reorganized Omagine;

e. To hear and rule upon all applications for Professional Compensation or payment of Insider Consultant Claims;

f. To remedy any defect or omission or reconcile any inconsistency in the Plan, as may be necessary to carry out the intent and purposes of the Plan;

g. To construe or interpret any provision of the Plan and, to the extent authorized by the Bankruptcy Code, to issue such orders as may be necessary for the implementation, execution and consummation of the Plan;

h. To adjudicate controversies arising out of the administration of the Estates or the implementation of the Plan;

i.   To make such determinations and enter such orders as may be necessary to effectuate all the terms and conditions of the Plan, including the Distribution of funds from the Pools and the payment of Allowed Claims;

j.   To determine any suit or proceeding brought by either Debtor or Reorganized Omagine to recover property under any provisions of the Bankruptcy Code;

k.   To hear and determine any tax disputes concerning either Debtor and to determine and declare any tax effects under the Plan;

l.   To determine such other matters as may be provided for in the Plan or the Confirmation Order or as may be authorized by or under the provisions of the Bankruptcy Code;

m.   To determine any controversies, actions or disputes that may arise under the provisions of the Plan or the rights, duties or obligations of any Person under the provisions of the Plan;

n.   To adjudicate any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with any agreement pursuant to which either Debtor sold any of its Assets during the Bankruptcy Cases; and

o.   To enter a Final Decree.

iv.   **Distributions**

a.   All Distributions under the Plan shall be made by Reorganized Omagine.

b.   ***Distributions of Cash***. Any Distribution of cash made by Reorganized Omagine pursuant to the Plan shall at Reorganized Omagine's sole option be made by check in USD drawn on a domestic U.S. bank or by wire transfer from a domestic U.S. bank. Notwithstanding the foregoing sentence, payment of the BSA Contingency Fee may be made from a non-U.S. bank or financial institution and may be paid in USD or in Omani Rials or may be effected by Omagine authorizing BSA to withhold from any Recovery such BSA Contingency Fee denominated in USD or Omani Rials.

c.   ***No Interest on Claims***. Unless otherwise specifically provided for in the Plan, the Confirmation Order or in a post-petition agreement in writing between Omagine and a Holder, post-petition interest shall not accrue or be paid on Claims and no Holder shall be entitled to interest accruing on or after the Filing Date on any Claim. Without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Final Distribution is made thereon when and if such Disputed Claim becomes an Allowed Claim.

d. ***Delivery of Distributions***. Distributions to Holders of Allowed Claims shall be made to such Holders by Reorganized Omagine at the Record Address for such Holder. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder shall be made unless and until Reorganized Omagine is notified of such Holder's then-current address, at which time all missed Distributions shall be made to such Holder without interest. Amounts in respect of undeliverable Distributions made in cash by Reorganized Omagine and returned as undeliverable to Reorganized Omagine shall be retained by Reorganized Omagine until such Distributions are claimed and, notwithstanding the foregoing or any other provision to the contrary contained herein, if any such undeliverable cash Distribution returned to Reorganized Omagine is not claimed within six (6) months from the date of receipt by Omagine of notice of such return, then the relevant Claim Holder thereof shall have irrevocably waived its right to such Distribution and such Distribution shall be irrevocably retained by Reorganized Omagine notwithstanding any federal or state escheat laws to the contrary.

e. ***Distributions to Claim Holders as of the Distribution Record Date***. All Distributions on Allowed Claims shall be made before, on or promptly after the Distribution Date to the Record Holders of such Claims. As of the close of business on the Distribution Record Date, the Claims register maintained by the Bankruptcy Court shall be closed, and there shall be no further change in the Record Holder of any Claim. Reorganized Omagine shall have no obligation to recognize any transfer of any Claim occurring after the Distribution Record Date. Reorganized Omagine shall instead be entitled to recognize and deal for all purposes under the Plan with the Record Holders of Claims as of the Distribution Record Date.

f. ***De Minimis Distributions; Fractional Dollars***. Reorganized Omagine shall have no obligation to make a Distribution to a Holder of an Allowed Claim if the amount to be distributed to such Holder has a value less than ten USD ($10.00). Any other provision of the Plan notwithstanding, Reorganized Omagine shall not be required to make Distributions or payments of fractions of USD or Omani Rials. Whenever any payment of a fraction of a USD or Omani Rial would otherwise be called for under the Plan, the actual payment shall reflect a rounding of such fraction to the nearest whole USD or Omani Rial (up or down), with half USDs or more or half Omani Rials or more being rounded up.

g. ***Withholding Taxes***. Reorganized Omagine shall comply with all withholding and tax reporting requirements imposed by any federal, state,

local, or non-US taxing authority and all Distributions under the Plan shall be subject to any such withholding and reporting requirements.

## 14. Confirmation and Consummation Procedure
## A. General Information

All Holders whose Claims are Impaired by the Plan may cast their votes for or against the Plan. Each of Class 1, Class 3 and Class 4 is an Impaired Class and entitled to vote to accept or reject the Plan. Class 2 is also an Impaired Class and the Holders thereof are entitled to vote to accept or reject the Plan but since all four of such Class 2 Holders are Insiders, their votes and the aggregate amount of their Claims will be disregarded in determining whether or not to accept or reject the Plan. Since the JOL Shares are not being converted in any manner but are being surrendered and extinguished and no Class 4 Claims are being paid, Class 4 is an Impaired Class. The Holders of the Class 4 Claims are therefore deemed to have rejected the Plan. Omagine as the Holder of the JOL Shares and the Proponent of the Plan, is deemed to have accepted the Plan. Class 5 is an Unimpaired Class and the Holders of the Class 5 Equity Interests are conclusively presumed to have accepted the Plan.

As a condition to confirmation of the Plan, the Bankruptcy Code requires that one Class of Impaired Claims votes to accept the Plan. Section 1126(c) of the Bankruptcy Code defines acceptance of the Plan by a Class of Impaired Claims as acceptance by Holders of (i) at least two-thirds of the dollar amount of the Class, and (ii) more than one-half in number of Claims in the Class. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code a Class is deemed not to have accepted a Plan if such Plan provides that the Claims or Interests of such class do not entitle the Holders of such Claims or Interests to receive or retain any property under the Plan on account of such Interests.

Voting is accomplished by Holders of Claims completing, dating, signing and returning their Ballots by the Voting Deadline. Ballots will be distributed to all Creditors entitled to vote on the Plan and a Ballot is part of the Solicitation Package accompanying the Disclosure Statement. The Ballot indicates the Voting Deadline and where the completed Ballot is to be returned.

In the event of a default by Reorganized Omagine in the making of a payment of an Allowed Claim under the Plan, the Holder of such Claim must, unless otherwise specified in the Plan to the contrary with respect to any Class of Claims, send written notice to Reorganized Omagine of the claimed default. Reorganized Omagine shall have ten (10) Business Days from its receipt of the notice of default to cure such default.

Unless otherwise specified in the Plan, all notices or other communications hereunder to Omagine or Reorganized Omagine shall be in writing and shall be deemed to have been duly given if delivered personally, sent via U.S. Certified Mail, Return Receipt or via internationally recognized overnight courier, to: Mr. Frank J. Drohan, President, Omagine,

Inc., 171 Glen Eagle Circle, Naples, Florida 34104, USA, and via email to: frank.drohan@omagine.com; with a copy to: Mr. Mitchell J. Rotbert, Rotbert Business Law P.C., 9059 Shady Grove Court, Gaithersburg, Maryland 20877, USA, and via email to: mitch@rotbertlaw.com; or to such other physical or email address that Omagine or Reorganized Omagine shall have designated via written notice to any such party in interest. Receipt of notice by Mr. Mitchell J. Rotbert shall not be deemed receipt by Omagine or Reorganized Omagine of the required notice.

**B.      Solicitation of Acceptances**

The Court has approved this Disclosure Statement as containing "adequate information" to permit Creditors to make an informed decision whether to accept or reject the Plan.

**C.      Acceptances Necessary to Confirm the Plan**

Each of Class 1, Class 2, Class 3 and Class 4 are Impaired Classes. Class 5 is an Unimpaired Class. At the Confirmation Hearing, the Court shall determine, among other things, whether the Creditors and Interest Holders have accepted the Plan. An Impaired Class will be deemed to accept the Plan if at least two-thirds in amount and more than one-half in number of the Claims in such Impaired Class vote to accept the Plan. Furthermore, unless there is unanimous acceptance of the Plan by the Impaired Classes, the Court must also determine that any non-accepting Class members will receive property with a value as of the Distribution Date that is not less than the amount that such Class member would receive or retain if Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

**D.      Confirmation of Plan Pursuant to Section 1129(b) of the Bankruptcy Code**

The Bankruptcy Code provides that the Plan may be confirmed even if all Impaired Classes do not accept it. To confirm the Plan without the requisite number of acceptances of each Impaired Class, the Court must find that at least one Impaired Class has accepted the Plan without regard to the acceptances of Insiders and the Plan does not discriminate unfairly against and is otherwise fair and equitable to any Impaired Class that does not accept the Plan. Accordingly, if any Impaired Class does not vote to accept the Plan, Debtors will seek to confirm the Plan under the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.

**E.      Considerations Relevant to Acceptance of the Plan**

Debtors' recommendation that all Creditors should vote to accept the Plan is premised upon Debtors' view that the Plan is preferable to other alternatives for liquidation of Debtors' Estates. It appears unlikely to Debtors that an alternate plan of reorganization or liquidation can be proposed that could timely provide for payments in an amount equal to or greater than the amounts possible under the Plan. In Debtors' opinion, if the Plan is not accepted, it is possible that the Claims of all Creditors will become worthless.

## <u>Disclaimer</u>

This Disclosure Statement contains summaries of certain provisions of the Plan, statutory provisions, documents related to the Plan, events in Debtors' Chapter 11 cases, and financial information. Although Debtors believe that the Plan and related document summaries are fair and accurate, such summaries are qualified to the extent that they do not set forth the entire text of such documents or statutory provisions. Information contained in this Disclosure Statement has been provided by Debtors' management, except where otherwise specifically noted. The financial data as of and prior to September 30, 2017 set forth herein or in the Plan has been derived from the Debtor's audited and unaudited consolidated financial statements which were prepared in conformity with the requirements of USGAAP and filed with the SEC. The last such audited consolidated financial statement filed with the SEC was for the Debtors' fiscal year ended December 31, 2016 and the last such unaudited consolidated financial statement filed with the SEC was for the Debtors' quarterly period ended September 30, 2017. The Form 12b-25 filed with the SEC on March 30, 2018 and attached to the Plan as Exhibit L also contains unaudited financial information. All other financial data has been provided by Debtors' management and has not been subjected to an independent audit. Debtors are unable to warrant or represent that the information contained herein or in the Plan, including the financial information, is without any inaccuracy or omission.

Nothing contained herein shall (1) constitute an admission of any fact or liability by any party, (2) be admissible in any non-bankruptcy proceeding involving Debtors or any other party; provided, however, that in the event Debtors default under the Plan, this Disclosure Statement may be admissible in a proceeding relating to such default for the purpose of establishing the existence of such default, or (3) be deemed conclusive advice on the tax or other legal effects of Debtors' Plan as to Holders of Claims or Interests. You should consult your personal counsel or tax advisor on any questions or concerns regarding tax or other legal consequences to you of the Plan.

Except for historical information, all the statements, expectations and assumptions, including expectations and assumptions contained in this Disclosure Statement and the Plan, involve several risks and uncertainties. Although Debtors have used their best efforts to be accurate in making these statements, it is possible that the assumptions made by Debtors in either this Disclosure Statement or in the Plan may not materialize.

Any eventual full amount or Pro-Rata Amount Distribution to Creditors as described herein and in the Plan is entirely dependent and contingent upon a Conclusion to the Oman Contract Case resulting in a Recovery in an amount sufficient to make such payments via the funding of the respective payment Pools utilized as described herein and, in the Plan, to make such Distributions. Several important legal, economic and political factors, including but not limited to the inherent risks of litigation, economic downturns, political upheaval in Oman or the Middle East and the amount of Allowed Claims could affect the prospect if any, and the amount if any, of a Recovery and therefore any eventual Distributions to

Creditors.

All Creditors and Interest Holders are advised and encouraged to read this Disclosure Statement and the Plan in their entirety. Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the Exhibits attached to the Plan and to this Disclosure Statement as a whole.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure and not in accordance with federal or state securities laws. This Disclosure Statement has neither been approved nor disapproved by the SEC nor has the SEC passed on the accuracy or adequacy of the statements contained herein. This Disclosure Statement was prepared to provide Holders of Claims and Interests with "adequate information" (as that term is defined in the Bankruptcy Code) so that such Holders can make an informed judgment about the Plan.

As to contested matters, adversary proceedings and other actions or threatened actions, neither this Disclosure Statement nor the Plan shall constitute or be construed as an admission of any fact or liability, stipulation, or waiver but rather as a statement made in settlement negotiations.

The information contained in this Disclosure Statement is included herein for the purpose of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to make a judgment with respect to the Plan and how to vote on the Plan.

The representations in this Disclosure Statement and in the Plan are those of Debtors. No representation concerning Debtors is authorized other than as set forth in this Disclosure Statement or in the Plan. Any representation or inducement made to secure acceptance of the Plan which is other than as contained in this Disclosure Statement or in the Plan should not be relied upon by any Person. Except as otherwise stated herein, the information contained herein has not been derived from audited financial statements. Every effort, however, has been made to provide adequate financial information in this Disclosure Statement. The representations by Debtors are not warranted or represented to be without any inaccuracy although every effort has been made to be accurate. Neither the Plan nor this Disclosure Statement has been designed to forecast consequences which follow from a rejection of the Plan although an attempt is made to state the consequences of a liquidation of Debtors.

June 27, 2022

                                        Omagine, Inc.
                                        Journey of Light, Inc.
                                        Debtors and Debtors in Possession

/s/ Frank J. Drohan

Frank J. Drohan

President